## JAMESTOWN & NEWPORT FERRY CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 2428.

Circuit Court of Appeals, First Circuit.
June 5, 1930.

Guy Mason, of Washington, D. C. (Mason Spalding & McAtee, of Washington, D. C., of counsel; Robert A. Littleton, of Washington, D. C., on the brief), for petitioner.

Randolph C. Shaw, Sp. Asst. to Atty. Gen. (C. A. Youngquist, Asst. Atty. Gen., J. Louis Monarch, Sp. Asst. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Dean P. Kimball, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for the Commissioner.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

ANDERSON, Circuit Judge.

This is an appeal from the Board of Tax Appeals holding the Jamestown & Newport Ferry Company subject to an income tax for the fiscal years 1922, 1923, and 1925. The facts are elaborately set forth in the opinion of the Board of Tax Appeals. We summarize them as follows:

The town of Jamestown is coterminus with Conanicut Island in Narragansett Bay. The town is about three miles west of Newport, located on another island, and approximately east of Sanderstown on the mainland. It has a permanent population of about 1,-500, and a summer population of about 5,-000. Its main industries are as a summer resort and for agriculture, consisting of dairy farms, poultry raising, and a little truck gardening. As early as 1872 the town appointed a committee to investigate and report upon the facts relating to the establishment of a ferry to Newport. In May, 1872, the town agreed to subscribe for 60 per cent. of the stock of a ferry association, to be organized, upon the condition that 40 per cent. be taken first by responsible individual subscriptions.

In May, 1873, the Jamestown & Newport Ferry Company was incorporated by a special act of the state Legislature, with an authorized capital stock of $100,000, and having the exclusive right to carry passengers and freight from Jamestown to Newport. This act was amended and supplemented by several acts on various dates, to June 30, 1923. Under these acts and by vote of the town, all the capital of the ferry company was furnished by or on the credit of the town of Jamestown, excepting only 40 per cent. of the original capital stock subscribed by private individuals. In 1923, the town voted for a loan to the ferry company of $100,000, secured by mortgage, and to issue its own serial bonds for that amount payable $10,-000 a year for ten consecutive years, with interest at 4¾ per cent.

This ferry furnishes the only means of transportation between Jamestown and Newport and with the mainland, except for some small private boats. It is expressly found that if no ferry were operated regularly, the island would lose a large percentage of its summer visitors, and that transportation to and from the island could be carried on only in small private boats, launches, and skiffs. Jamestown high school children, some 60 in number, attend the high school at Newport. The school children, police, firemen, and other town officials and employees are transported by the ferry company without charge to them, and nothing is paid by the town for such transportation. All other persons pay the regular rates—a straight fare of 15 cents one way, with a weekly and monthly rate of 10 cents one way for commuters. The company now owns three ferryboats, as well as landing wharves at Jamestown and Sanderstown. It employs from 50 to 60 laborers. From about November 1 to May 1 the ferries are usually operated at a loss. The annual operating expenses, including repairs and improvements, approximately equal the gross income each year. The gross annual income varies from approximately $160,000 to $170,000.

The town has always held a majority of the capital stock, and in 1924 and later acquired and now holds all the capital stock. The board of directors of five consisted, prior to the acquisition, of a ferry committee elected annually by the town, and two additional stockholders chosen by the town committee. Since 1916 or 1917, the treasurer has been paid a salary of $500 a year. No dividends have ever been paid upon the capital stock. Financially the ferry company has always been a town enterprise, financed by or on the credit of the town.

The questions are whether the ferry company's income, or at least that proportion thereof which the stock owned by Jamestown bears to the total stock outstanding, is exempt from federal income tax under section 213 (b) (7) of the Revenue Acts of 1921 (42 Stat. 238) and 1924 (26 USCA § 954(b) (7).

Under these provisions, "gross income"

"(b) Does not include the following items, which shall be exempt from taxation under this title: * * *

"(7) Income derived from any public utility or the exercise of any essential governmental function and accruing to any State, Territory, or the District of Columbia, or any political subdivision of a State or Territory, or income accruing to the Government of any possession of the United States, or any political subdivision thereof.

"Whenever any State, Territory, or the District of Columbia, or any political subdivision of a State or Territory, prior to September 8, 1916, entered in good faith into a contract with any person, the object and purpose of which is to acquire, construct, operate, or maintain a public utility, no tax shall be levied under the provisions of this title upon the income derived from the operation of such public utility, so far as the payment thereof will impose a loss or burden upon such State, Territory, District of Columbia, or political subdivision; but this provision is not intended and shall not be construed to confer upon such person any financial gain or exemption or to relieve such person from the payment of a tax as provided for in this title upon the part or portion of such income to which such person is entitled under such contract."

█ It is well settled that, independently of statutory exemption, the property of the states and the instrumentalities of their governmental powers and duties are exempt from federal taxation. Ambrosini v. United States, 187 U. S. 1, 7, 23 S. Ct. 1, 47 L. Ed. 49; Pollock v. Farmers' Loan & Trust Co., 157 U. S. 429, 584, 15 S. Ct. 673, 39 L. Ed. 759; United States v. Railroad, 17 Wall. 322, 21 L. Ed. 597; Collector v. Day, 11 Wall. 113, 20 L. Ed. 122.

But, as said in Flint v. Stone Tracy Co., 220 U. S. 107, 157, 158, 31 S. Ct. 342, 351, 55 L. Ed. 389, Ann. Cas. 1912B, 1312: "But this limitation has never been extended to the exclusion of the activities of a merely private business from the Federal taxing power, although the power to exercise them is derived from an act of incorporation by one of the states." Compare also Union P. Railroad v. Peniston, 18 Wall. 5, 21 L. Ed. 787; Osborn v. Bank of United States, 9 Wheat. 738, 859, 6 L. Ed. 204; South Carolina v. United States, 199 U. S. 437, 26 S. Ct. 110, 50 L. Ed. 261, 4 Ann. Cas. 737. In this case, the court, with three justices dissenting, held that the agencies of the state of South Carolina carrying on the liquor traffic were not exempt from the operation of the internal revenue laws of the United States. The distinction between the two lines of cases is fine.

As pointed out by Mr. Justice Stone in Metcalf & Eddy v. Mitchell, 269 U. S. 514, 522, 46 S. Ct. 172, 174, 70 L. Ed. 384: "Just what instrumentalities of either a state or the federal government are exempt from taxation by the other cannot be stated in terms of universal application." And again (page 523 of 269 U. S., 46 S. Ct. 172, 174, 70 L. Ed. 384): "As cases arise, lying between the two extremes, it becomes necessary to draw the line which separates those activities having some relation to government, which are nevertheless subject to taxation, from those which are immune. Experience has shown that there is no formula by which that line may be plotted with precision in advance. But recourse may be had to the reason upon which the rule rests, and which must be the guiding principle to control its operation."

In this opinion, practically all the cases cited and relied upon by the Board of Tax Appeals in the instant case are cited and reviewed. For present purposes, we think the above quotations sufficiently illustrate the distinctions between the two lines of cases.

A later decision is that of Panhandle Oil Co. v. Mississippi, 277 U. S. 218, 222, 48 S. Ct. 451, 452, 72 L. Ed. 857, 56 A. L. R. 583. This involves a gasoline tax levied by the state on gasoline sold to the United States for the use of its coast guard fleet and its veterans' hospital. A bare majority of the court held the tax invalid on the ground that

"the necessary operation of these enactments * * * is directly to retard, impede, and burden the exertion by the United States of its constitutional powers to operate the fleet and hospital * * * to exact tribute on its transactions and apply the same to the support of the State."

The instant case does not require us to go so far as did the majority of the court in the Panhandle Oil Case, in order to hold it beyond the power of Congress to levy the taxes in question. Compare also Haley v. Boston, 191 Mass. 291, 77 N. E. 888, 5 L. R. A. (N. S.) 1005, and cases cited. This case holds that when the city under an ordinance removes ashes, etc., without charge or profit, it is not liable in tort for the negligence of one of its drivers.

We conclude the statute, fairly construed, imports no intent by Congress to levy such taxes. The statute, supra, provides that "gross income" shall not include "income derived from any public utility or the exercise of any essential governmental function and accruing to any State * * * or any political subdivision of a State." The general purpose there expressed is repeated by later language in the provision that, "Whenever any State * * * or any political subdivision of a State * * * prior to September 8, 1916, entered in good faith into a contract with any person, the object and purpose of which is to acquire, construct, operate, or maintain a public utility, no tax shall be levied under the provisions of this title upon the income derived from the operation of such public utility, so far as the payment thereof will impose a loss or burden upon such State * * * or political subdivision."

While it may not be clear that the town was operating this public utility under a contract, the arrangement outlined above was at least as effective a means of operation as though a formal contract had been made.

The only reason why Jamestown had no income accruing to it from this public utility was because, as operated, the public utility had no net income. Perhaps if the ferry company had not furnished free transportation to the high school pupils and town officials, it might have had such an income. As already pointed out, financially the enterprise was as effective a municipal enterprise as though it had been operated directly by the town. Taxation was, apart from the original contributions of 40 per cent. of its stock, which never received any dividends

whatsoever, the sole financial basis of its operations.

█ If necessary for the case (and we do not think it is), we might distinguish this ferry from many others, owing to the fact that Jamestown is an island, and that without this ferry the inhabitants would have had no access by public facilities either to Newport, another island, or to the mainland. As related to Jamestown, this ferry was, in function, indistinguishable from a bridge or other necessary portion of a highway. All ferries are, in general, regarded as publici juris. See United States v. King County, 281 F. 686 (C. C. A. 9th), and authorities cited.

█ But this ferry was essential to the normal life of this community, not a mere matter of additional public convenience, like many other ferries. Limiting our decision to the facts of this case, we have no hesitation in holding that none of the income derived by this ferry company was subject to income tax by the federal government.

The decision of the Board of Tax Appeals is reversed, and the case is remanded to the Board for further proceedings not inconsistent with this opinion.