**CITIZENS WATER CO. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 10548.

Circuit Court of Appeals, Eighth Circuit.

Feb. 4, 1937.

Rehearing Denied Feb. 25, 1937.

La Monte Cowles, of Burlington, Iowa, for petitioner.

S. Dee Hanson, Sp. Asst. to the Atty. Gen. (Robert H. Jackson, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to the Atty. Gen., on the brief), for respondent.

Before STONE, WOODROUGH, and THOMAS, Circuit Judges.

STONE, Circuit Judge.

This is a petition to review redeterminations by the Board of Tax Appeals of the corporation income taxes of petitioner for the years 1930 and 1931.

Petitioner is a corporation organized under the statutes of Iowa and engaged in the business of furnishing water to the city of Burlington, Iowa. Its net income for 1930 was $43,804.80 and for 1931 was $32,349.55. Petitioner claimed these incomes were entirely exempt under the provisions of Section 116(d) of the Revenue Act of 1928 (45 Stat. 791, 823 [26 U.S.C.A. § 116 and note]). The Board sustained the determination of the Commissioner that the entire incomes were taxable. The broad issue presented here is whether these incomes are entirely exempt. Petitioner contends to tax such incomes would be opposed to the Constitution and to the above section of the statute because such net incomes accrued to and are the property of the city. It bases this claim that such incomes belong to the city upon the relation and situation created by a contract between petitioner and the city, the contract having the form of a city ordinance accepted by petitioner.

Under the ordinance (approved October 10, 1902), petitioner was to be capitalized for $330,000, of which $150,000 was to be 6 per cent. cumulative common stock and $180,000 to be 5 per cent. cumula-

tive preferred stock. The preferred and $100,000 of the common stock were to be subscribed at par—the remaining $50,000 common stock to belong to the city. The preferred stock was "subject to retirement out of surplus earnings in the water fund, as the city may direct, 60 days' notice in writing to be given by the city to the company." The company was to have a board of five directors of whom two were to be selected by the city. · To provide for extensions and improvements agreed to by the city, the company was entitled to issue first mortgage 4 per cent. bonds to the amount of $220,000. These bonds to be indorsed by the mayor and "authenticated by the seal of said city" with a statement of the "present" assessed value of property subject to the water tax together with a stipulation that "from said water tax, the city will pay the semi-annual interest upon said bonds, before any money shall be taken therefrom, for any other purpose."

The company was to fix water rates to private consumers not to exceed a stated standard. The company was to furnish water to the city for fire, city buildings and sewer flushing in return for a five-mill "water tax" to be annually collected on real estate within a "water district" comprising the portions of the city benefited or protected by the water system—this tax not to be diminished until a surplus should be accumulated by petitioner.

This tax with the earnings of the company to constitute a "water fund" from which payments were to be made in the order for the purposes following. First, interest on outstanding bonds[1]; second, current expenses, repairs and "all taxes that may be levied upon said waterworks or upon the stock held by the stockholders in said company"; third, dividends on preferred stock; fourth, dividends on common stock—such dividend payments to include current and accumulated dividends. After setting aside $1,000 for contingencies, any surplus after the above payments "may be used in making extensions and improvements, * * * or in retiring five per cent [preferred] stock, or in creating a sinking fund, either, as the city may determine and direct."

As to expenditures by the company, it was provided that only certain designated officials should receive salaries; that semi-annual itemized reports of receipts and expenditures should be made to the city; that the company books should be open to inspection by the city; that "no expenditures exceeding one thousand dollars for any purpose whatever excepting current expenses or in case of emergency shall be made against the objections of the two directors chosen by the city, unless the proposed expenditure is first submitted to and improved [approved?] by arbitrators"; that all "new work, improvements or betterments" must be approved by the city.

After five years and upon one-year notice, the city might take over the property "upon then assuming all the duties and liabilities devolving upon said company, and repaying to its stockholders, par for all the then outstanding capital stock, with all accrued and unpaid dividends, and with interest at the specified dividend rate, on the par value of said stock, from the date when the last dividend accrued, down to the time when such payment is made."

Also it was provided: "It is intended by this ordinance, that said company shall make an annual net dividend at the rates hereinbefore specified, upon all cash actually paid in upon its stock, and no more. But it must rely for the means of making such dividends, entirely upon the water fund aforesaid. Nothing for this purpose or for defraying any of the other expenses connected with said works shall ever be payable out of the proceeds of the general revenues of said city. But the special tax hereinbefore provided for, shall never be so far diminished as to prevent the annual dividends by said company, upon the cash payments on its stock, as hereinbefore provided."

Petitioner was organized under chapter 1, title 9 of the state statutes, Code 1897, § 1607 et seq. (now chapter 384 of the Iowa Code of 1931 [section 8339 et seq.]) entitled "Of Corporations for Pecuniary Profit." The articles of incorporation were executed shortly before and were filed shortly after the ordinance was passed and accepted. They contained provisions as to capital stock, dividends, retirement of preferred stock, and representation of the city on the board of di-

---

[1] The tax was to be collected by the city which retained and paid direct to the bondholders the interest—turning over to the company any amount collected beyond that needed for the next semiannual interest payment.

rectors which were in harmony with the requirements of the ordinance.

During the tax years (1930 and 1931) involved here, the entire authorized capital stock (common and preferred) was outstanding as well as bonds in the amount of $148,000. The city held the 500 shares of common stock provided for in the ordinance. Also, it owned 537 shares of the preferred stock (25 shares being issued in the name of the Firemen's Pension) and $68,500 of the bonds. These shares of preferred stock were acquired from time to time in varying amounts. Just when the bonds were acquired does not appear. Also, it is not shown from what funds of the city these preferred shares and bonds were purchased.

In these tax years the prescribed dividends on both classes of stock were paid. For those two years, the operating revenues were $162,339.30 (for 1930) and $159,912.33 (for 1931), of which the five mill tax yielded $28,077.35 and $25,979.-39, respectively—being designated as the return for "Municipal Service." During these years, additions to plant were made from earnings in the respective amounts of $65,952.17 and $71,447.40.

An outline of the above arrangement is as follows: A private corporation wherein the city owned one-third of the voting stock with the right to a directorate representation of two-fifths. A limitation of dividends. Limitations upon and a certain supervision of financial expenditures. A right in the city to compel retirement of preferred stock from surplus earnings. This corporation operating under an exclusive franchise whereunder it fixed water rates to private consumers and furnished water for public purposes in return for the proceeds from a defined water tax. A right of purchase by the city.

With this fact situation in mind, we turn to the legal issues presented by petitioner's contentions (1) that this company is a governmental agency of the city and, as such, its income is beyond the taxing power of Congress, and (2) that it is not taxable under the Revenue Act of 1928 because excluded by Section 116 (d) thereof.

### (1) Governmental Agency.

■■ We start with the established rule of law that governmental agencies of a political subdivision of a state are not within the taxing power (income or otherwise) of the national government. Burnet v. Coro-nado Oil & Gas Co., 285 U.S. 393, 399, 52 S.Ct. 443, 444, 76 L.Ed. 815; Indian Motocycle Co. v. United States, 283 .U.S. 570, 575,.51 S.Ct. 601, 602, 75 L.Ed. 1277; United States v. Baltimore & O. Railroad Co., 17 Wall. 322, 21 L.Ed. 597. The question here is whether this corporation in this situation is such an instrumentality. "Just what instrumentalities of either a state or the federal government are exempt from taxation by the other cannot be stated in terms of universal application." Metcalf & Eddy v. Mitchell, 269 U.S. 514, 522, 46 S.Ct. 172, 174, 70 L.Ed. 384, quoted in Burnet v. Coronado Oil & Gas Co., 285 U.S. 393, 399, 52 S.Ct, 443, 444, 76 L.Ed. 815. However, it has been determined that "those agencies through which either government immediately and directly exercises its sovereign powers, are immune from the taxing power of the other" (Metcalf & Eddy v. Mitchell, 269 U.S. 514, 522, 46 S.Ct. 172, 174, 70 L.Ed. 384; Burnet v. Coronado Oil & Gas Co., 285 U.S. 393, 399, 52 S.Ct. 443, 444, 76 L.Ed. 815) while "as to persons or corporations which serve as agencies of government, national or state, and also have private property or engage on their own account in business for gain, it is well settled that the principle does not extend to their private property or private business, but only to their operations or acts as such agencies." Indian Motocycle Co. v. United States, 283 U.S. 570, 576, 51 S.Ct. 601, 603, 75 L.Ed. 1277.

Without examination or determination and solely for the purposes of this case, we accept the view that the furnishing of water to the citizens of and to a city is a governmental function. In selecting . the means by which this function shall .be' carried out, the city has a wide and varied choice. One extreme is where the city owns and operates its own plant without supervening agency. The other extreme is where the service is furnished .by a purely private person or corporation under a license or franchise which imposes little or no supervision or control. In the first of these instances, any tax by the nation even on property or income would be clearly void. In the other instance, there could be no question of the existence of such taxing power because the effect upon the city would be too remote. Between these two extremes are all manner of gradations each of which will fall under one or the other rule. A few examples of such gradations are Clallam County v. United States, 263 U.S. 341, 44 S.Ct. 121,· 68 L.

Ed. 328; Baltimore Shipbuilding & Dry Dock Co. v. Baltimore, 195 U.S. 375, 25 S.Ct. 50, 49 L.Ed. 242; Central Pacific Railroad Co. v. California, 162 U.S. 91, 16 S.Ct. 766, 40 L.Ed. 903; Union P. Railroad Co. v. Peniston, 18 Wall. 5, 21 L.Ed. 787; Thomson v. Union Pacific R. R. Co., 9 Wall. 579, 19 L.Ed. 792, and Jamestown & Newport Ferry Co. v. Commissioner, 41 F.(2d) 920 (C.C.A.1).

It seems to us that petitioner falls within the class subject to such taxation. It was not a corporation organized and entirely owned by the city (analogous to the situation in Clallam County v. United States, 263 U.S. 341, 345, 44 S.Ct. 121, 122, 68 L.Ed. 328) nor one privately organized but controlled and practically owned by the city and not really operated for profit. Jamestown & Newport Ferry Co. v. Commissioner, 41 F.(2d) 920 (C.C.A.1). It is a private corporation organized for the profit of its shareholders. The situation is quite like that in Union P. Railroad Co. v. Peniston, 18 Wall. 5, at page 31, 21 L. Ed. 787, which is described by the Court as follows:

"It is insisted on behalf of the plaintiffs that the tax of which they complain has been laid upon an agent of the General government constituted and organized as an instrument to carry into effect the powers vested in that government by the Constitution, and it is claimed that such an agency is not subject to State taxation. That the Union Pacific Railroad Company was created to subserve, in part at least, the lawful purposes of the National government; that it was authorized to construct and maintain a railroad and telegraph line along the prescribed route, and that grants were made to it, and privileges conferred upon it, upon condition that it should at all times transmit dispatches over its telegraph line, and transport mails, troops, and munitions of war, supplies and public stores, upon the railroad for the government, whenever required to do so by any department thereof, and that the government should at all times have the preference in the use of the same for all the purposes aforesaid, must be conceded. Such are the plain provisions of its charter. So it was provided that in case of the refusal or failure of the company to redeem the bonds advanced to it by the government, or any part of them, when lawfully required by the Secretary of the Treasury, the road, with all the rights, functions, immunities, and appurtenances thereunto belonging, and also all lands granted to the company by the United States which at the time of the default should remain in the ownership of the company, might be taken possession of by the Secretary of the Treasury for the use and benefit of the United States. The charter also contains other provisions looking to a supervision and control of the road and telegraph line, with the avowed purpose of securing to the government the use and benefit thereof for postal and military purposes. It is unnecessary to mention these in detail. They all look to a purpose of Congress to secure an agency competent and under obligation to perform certain offices for the General government. Notwithstanding this, the railroad and the telegraph line are neither in whole nor in part the property of the government. The ownership is in the complainants, a private corporation, though existing for the performance of public duties. The government owns none of its stock, and though it may appoint two of the directors, the right thus to appoint is plainly reserved for the sole purpose of enabling the enforcement of the engagements which the company assumed, the engagements to which we have already alluded.

"Admitting, then, fully, as we do, that the company is an agent of the General government, designed to be employed, and actually employed, in the legitimate service of the government, both military and postal, does it necessarily follow that its property is exempt from State taxation?"

The court answered its question as follows (18 Wall. 5, at page 36, 21 L.Ed. 787):

"It is, therefore, manifest that exemption of Federal agencies from State taxation is dependent, not upon the nature of the agents, or upon the mode of their constitution, or upon the fact that they are agents, but upon the effect of the tax; that is, upon the question whether the tax does in truth deprive them of power to serve the government as they were intended to serve it, or does hinder the efficient exercise of their power. A tax upon their property has no such necessary effect. It leaves them free to discharge the duties they have undertaken to perform. A tax upon their operations is a direct obstruction to the exercise of Federal powers.

"In this case the tax is laid upon the property of the railroad company precisely as was the tax complained of in Thom-

son v. Union Pacific R. Co. It is not imposed upon the franchises or the right of the company to exist and perform the functions for which it was brought into being. Nor is it laid upon any act which the company has been authorized to do. It is not the transmission of dispatches, nor the transportation of United States mails, or troops, or munitions of war that is taxed, but it is exclusively the real and personal property of the agent, taxed in common with all other property in the State of a similar character. It is impossible to maintain that this is an interference with the exercise of any power belonging to the General government, and if it is not, it is prohibited by no constitutional implication."

The only difference between the above general situation in the Peniston Case and this case is that the city here owned a minority of the voting stock—a difference not decisive.

Petitioner contends that the important and controlling element in the situation here is that the tax directly affects its surplus earnings and that such surplus earnings belonged to the city. It is clear that the tax will affect such surplus by a reduction to the amount of the tax. But is it true that this surplus "belonged to and became the property of the City of Burlington"? Petitioner argues it did because "The setting aside of surplus and making it a part of the water fund, which is compulsory under the terms of the ordinance definitely placed the control of said fund in the hands of the city and said income by so placing it and setting it up as a part of the water fund made it a part of the income derived and accruing to any State, Territory or District of Columbia or any political subdivision of a state or territory." The portion of the ordinance dealing with surplus is section 13 which is as follows: "Should the said water fund prove inadequate in any one year, to meet all the foregoing claims upon it for that year, the deficit shall be made good out of any surplus that may remain in any subsequent year, after the payment of the claims enumerated in the two preceding sections; and should the said water fund be more than sufficient for all the purposes aforesaid, the surplus, after setting aside one thousand dollars for contingencies may

be used in making extensions and improvements of the water works, or in retiring five per cent stock, or in creating a sinking fund, either, as the city may determine and direct." While this provision gives the city a power of direction as to the use of the surplus, that power is limited to the three uses (1) of extensions and improvements; (2) retirement of preferred stock; and (3) creation of a sinking fund (the purposes and uses of such sinking fund being undefined). This falls far short of ownership or any interest approximating ownership. We are constrained to hold that the constitutional power exists in Congress to tax the income of petitioner.

#### (2) The Revenue Act.

Having the power to tax such income, the contention remains that Congress has, in section 116 (d) of the Act, exempted such income. In examining this matter, we keep in mind the limits of the issue as presented here. The city is not a party, hence, what separate rights it may have as distinguished from those of petitioner are not before us. The rights of the city are pertinent here only as they may be affected by the rights of petitioner. The contention here is that the act exempts the entire income, including that going to the stockholders.

It is unnecessary here to construe section 116 (d) further than to determine that the section very clearly expresses the limitation that only the income accruing to the city is exempt and that the income going to private parties is not.[2]

Nor is it necessary for us to determine whether the dividends coming to the city on its stock of petitioner are exempt and that the tax should not apply thereto. The statute requires collection of the entire tax with refund of any part falling on the city and exempt under the section if, "by the terms of such contract the tax imposed by this title [chapter] is to be paid out of the proceeds from the operation of such public utility, prior to any division of such proceeds between the person and the * * * political subdivision." Section 116 (d) (1), 26 U.S.C.A. § 116 and note. The provisions of this ordinance (section 12) are that, before any dividends are paid or any surplus can arise, the current expenses "including also all taxes that

---

[2] The section is unambiguous. If it were not so clear the legislative history would lead to the same conclusion (Cong. Rec. vol. 50, pp. 5320–5322; H. R. Rep. 179, p. 21, 68th Cong., 1st Session.)

may be levied upon said water works or upon the stock held by the stockholders" shall be paid. Thus, the requirement of collection and subsequent refund in section 116 (d) (1) applies here. This provision for administrative procedure (S.Rep. 398, p. 24, 68th Cong., 1st Session and S.Rep. 960, pp. 19–20, 70th Cong., 1st Session) does not allow the city, even if the matter taxed comes within the exemption, to proceed except as for a refund where any part of the matter taxed is without the exemption. Here, a part, at least, of the income of petitioner goes to private stockholders. Hence, even if the city were a party here the entire tax would be collected in the first instance.

The orders of the Board are affirmed.