**MARYLAND SAVINGS–SHARE INSURANCE CORPORATION**

v.

**UNITED STATES of America.**

Civ. A. No. 19330.

United States District Court
D. Maryland.

Jan. 22, 1970.

Richard W. Case and P. Dennis Belman, Baltimore, Md., for plaintiff.

Stephen H. Sachs, U. S. Atty., and Alan B. Lipson, Asst. U. S. Atty., Baltimore, Md., and Edward J. Snyder, Dept. of Justice, Washington, D. C., for the United States.

NORTHROP, District Judge.

Maryland Savings-Share Insurance Corporation, a Maryland corporation, seeks to recover $40,898.02 paid to the United States Treasury as federal income tax. This court concludes that Maryland Savings-Share Insurance Corporation is entitled to the refund.

Maryland Savings-Share Insurance Corporation (MSSIC) is a non-profit corporation created by the Maryland legislature under a special statutory charter. The primary purpose of the corporation is to insure the free-share accounts of member savings and loan associations, but it also serves to promote the elasticity and flexibility of the resources of member associations and to aid the liquidity of member associations by providing a central reserve fund. In the late 1950's and early 1960's a number of savings and loan associations collapsed. The lack of state control over these institutions made the citizens of Maryland fair game for shady operators. The public was bilked out of millions. Many persons lost their life savings. There was a scandal of considerable magnitude. The governor responded to the situation by creating two commissions which studied the savings and loan industry and proposed legislation regulating it. The commissions' study of the industry also showed that there was no existing private corporation which could adequately insure the deposits of the associations, so the commissions also proposed that the state create an insurer for those savings and loans which did not qualify for federal insurance programs. MSSIC was created by a special act of the Maryland General Assembly. See Md. Ann. Code art. 23, §§ 161MM–161AAA (1968). Three of the eleven members of

MSSIC's board of directors are selected by the governor. No association may become a member of MSSIC without first having been approved by the State Department of Building, Savings and Loan Associations. Bylaws of the corporation may not be changed without the approval of the Department of Building, Savings and Loan Associations. MSSIC's charter, however, explicitly provides that neither the faith nor the credit of the state is pledged to MSSIC's obligations. Md. Ann. Code art. 23, § 161RR. The source of MSSIC's capital is the contribution by member associations of two percent of their free-share accounts, and the earnings from the investment of such contributions by member associations. The corporation's charter specifically provides that no part of the earnings of the corporation shall be returned to member associations; but, since no provision is made for distribution of accumulated income, any such accumulated income would presumably escheat to the state upon the dissolution of MSSIC. *See* Md. Ann. Code art. 23, § 161NN(c). It is only in that sense that MSSIC can be said to be financially related to the state.

MSSIC asserts that it should be exempt from federal income taxes. It gives three reasons. First, MSSIC claims its income is exempt under the Internal Revenue Code of 1954, § 115(a) (1), which exempts income derived from the exercise of an "essential governmental function" and "accruing" to the state or a political subdivision thereof. Second, MSSIC asserts that it is immune from federal income taxation by reason of the doctrine of intergovernmental tax immunity. Third, MSSIC claims that the 1957 cutoff date in the Internal Revenue Code of 1954, § 501(c) (14), which section exempts essentially identical corporations from taxation, is arbitrary and, as such, a denial of the right to due process guaranteed by the Fifth Amendment.

■ MSSIC's statutory claim under the Internal Revenue Code of 1954, § 115 (a) (1), does not reach the constitutional proportions its other claims reach, so it will be considered first. In order to qualify for exemption under the Internal Revenue Code of 1954, § 115(a) (1), income must both be derived from an "essential governmental function" and "accrue" to the state. The United States argues that MSSIC's income does not "accrue" to the state of Maryland. It asserts that accrual is to be taken in an accounting sense and that the mere possibility of an escheat to the state upon dissolution does not constitute an accrual.

■ In support of its position the United States cites Omaha Public Power District v. O'Malley, 232 F.2d 805 (8th Cir. 1959). In that case a nonprofit citizens' group, anticipating Nebraska legislation that would establish a power district as a public corporation and political subdivision and themselves interested in insuring that the utilities were in fact placed under the control of such a corporation, purchased all the stock of a Nebraska power company. The power company, however, supplied services to both Nebraska and Iowa. Doubtful as to whether the power district could lawfully carry on operations outside Nebraska, the citizens' group set up an Iowa corporation for the purpose of operating those facilities located in Iowa. It was contemplated that the Iowa corporation would be sold as soon as was practicable and the proceeds of the sale paid to the Nebraska power district. The Iowa corporation paid no dividends during the period involved, so the group of private citizens itself received no income from the transaction. Federal income taxes were imposed on the Iowa corporation, and the power district sought a refund under the 1939 Code equivalent of section 115(a) (1), section 116(d). The power district claimed that the term "accruing" means "inuring". It argued that the Iowa corporation's receipt of income "inured" to the power district and that that was enough to meet the accrual test. The Eighth Circuit concluded that the accrual test was not met. It construed "accrue" to mean vesting as an enforceable right. The United States argues that the *Omaha Public*

*Power District* case establishes that accrual to a corporate entity separate from the state is not a sufficient accrual to the state. Given the kind of corporate entity involved in *Omaha Public Power District*, the United State's contention is correct. *Accord*, Burlington v. United States, 148 F.2d 887 (8th Cir. 1945). In Revenue Ruling 59–41, 1959–1 CUM. BULL. 13, on the other hand, the income of a non-profit corporation established by a municipality under the general laws of the state for the purpose of purchasing a water system was held not to be taxable. There, however, the municipality in question was to get title to the water system when the corporation's indebtedness was paid in full. Furthermore, surplus income of the current year was paid to the municipality's general fund. Thus, Revenue Ruling 59–41 would seem to establish that accrual to a corporate entity distinctly separate from the state may be deemed an accrual to the state. That ruling, however, did not purport to construe section 115 (a). It merely concluded that the income would not be deemed income within the meaning of section 61 of the Internal Revenue Code. In light of that ruling, however, it cannot be said that accrual to MSSIC is not an accrual to the state simply because MSSIC is a corporation. At the same time, the situations described in both *Omaha Public Power District* and Revenue Ruling 59–41 are factually distinguishable from the MSSIC situation. The corporation in question in *Omaha Public Power District* was a profit corporation organized under the general corporation statute of the state; MSSIC is a non-profit corporation created by special statutory charter by the state legislature. In Revenue Ruling 59–41, the municipality in question was to get title to the water system when the corporation's indebtedness was paid in full and the corporation's accumulated income of the current year was paid into the municipality's general fund; the state of Maryland has no interest in the capital contributed by member associations and accumulated income

would be paid to the state only in the event of an escheat upon dissolution of the corporation.

MSSIC asserts that the required accrual to the state occurs when MSSIC realizes income on its investment of the capital contribution of its members. MSSIC argues that many state departments are allowed to collect funds and spend them in the course of their operations without being required to go through the lengthy and really unnecessary process of, first, paying those funds to the state treasury and, then, having them reallocated to the department by the treasury. Thus under MSSIC's construction of section 115, the crucial issue is whether the activity is an "essential governmental function," not whether there is a technical accrual to the state. Under the MSSIC construction of section 115, the determination that an activity is an essential governmental function strongly implies that the income derived accrues to the state.

■■■■ This court accepts neither onstruction in its entirety. This court feels that the accrual requirement can only be interpreted in the light of the purpose of section 115. While no legislative history was cited by either party, it seems fair to say that the purpose of the exemption enacted in section 115(a)(1) was to insure that local governments, state, county, and municipal, would not be hampered in the performance of their functions by the imposition of federal income taxes. Thus construed, the determination that the section 115(a) exemption should be extended to a taxpayer requires a weighing of how central the activity sought to be taxed is to the operation of state government and of how directly taxation of the income of the activity will burden the state treasury. While the requirements of "essential governmental function" and "accrual" are not independent, either may be so lacking that the test of section 115(a) is not met. This court holds that the accrual aspect of the test for section 115(a) exemption is so lacking. With MSSIC, the state has absolutely no

financial obligations. At no time will the reduction in accumulated earnings caused by federal taxation of MSSIC's income cause the state to pay anything out to MSSIC or its creditors. No state funds are part of the capital which produces MSSIC's income; all such funds are derived from member associations. Therefore, MSSIC's claim for exemption under section 115(a) fails for failure to meet the accrual test.

Alternatively, this court believes that the claim for exemption under section 115(a) fails because MSSIC does not meet the "essential governmental function" requirement of that section. MSSIC urges that those private corporations that have undertaken to provide the service MSSIC provides have either failed or been frauds and that the only corporations successfully performing the function are state or federal corporations. The states of Ohio and Massachusetts have such corporations as does the federal government in the Federal Savings and Loan Insurance Corporation. MSSIC thus concludes that it is performing an essential governmental function. The United States, on the other hand, points out that savings and loan associations in 47 other states operate with no such insurance program. The only case MSSIC cites construing the "essential governmental function" requirement is Jamestown & Newport Ferry Co. v. C.I.R., 41 F.2d 920 (1st Cir. 1930). In that case the income of a ferry company was held to be immune from federal taxation under a predecessor to section 115(a). The entire capital stock of the ferry company was owned by the town of Jamestown, Rhode Island. The company operated ferries between the island in Narragansett Bay on which the town was situated and the mainland. Deeming the ferry essential to the normal life of the community, the First Circuit decided the company's income should be exempt from federal taxation. The court concluded that the ferry was not merely a matter of "public convenience." Without the facility the inhabitants of the island had no other means

of access to the mainland. In that case, however, the corporation was financed by the town or by use of the town's credit. Thus the function was deemed sufficiently essential by the town to lay its money on the line and federal income taxes were being imposed on the earnings of the town's money. The state of Maryland has no such investment in MSSIC. Therefore, *Jamestown & Newport Ferry Co.* is not determinative of the issue here.

MSSIC also cites intergovernmental tax immunity cases to establish that MSSIC's activity is an essential governmental function. The relationship between section 115(a) and the doctrine of intergovernmental tax immunity is not clear, however; so the applicability of those cases to the issue here is not clear. As noted briefly above, the apparent purpose of the section 115(a) exemption would seem to be the same as that of the immunity afforded under the implied constitutional principle of intergovernmental tax immunity, i. e., to avoid overburdening state governments. It is not clear that the common purpose requires that the scope of the two exemptions need be identical, but that does seem a sensible result. Thus, this court feels the cases cited by MSSIC are to be contended with. Specifically, MSSIC cites cases determining that Army Post Exchanges and the American Red Cross are federal instrumentalities such that they should be immune from state taxation, Department of Employment v. United States, 385 U.S. 355, 87 S.Ct. 464, 17 L.Ed.2d 414 (1966) (Red Cross) and Standard Oil Co. v. Johnson, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942) (Post Exchanges). MSSIC argues that the same factors relied upon by the Supreme Court to determine that post exchanges and the Red Cross are instrumentalities of the federal government are present in this case and dictate that MSSIC be found an instrumentality of Maryland, performing an essential governmental function. As to post exchanges, the exchanges were created under regulations promulgated by the Sec-

retary of War; money from dissolved exchanges is paid over to the federal government; Congress appropriates money for the construction of buildings for exchanges; the commanding officer of the post has authority to establish a post exchange; and profits of the exchange's operations go to activities designed to improve the pleasure and comfort of the troops. The federal government, however, assumes none of the financial obligations of the exchange. With the Red Cross, the organization was chartered by Congress; its principal officer is appointed by the President, as are seven of the 49 governors; the organization is under executive order to meet the country's obligations under various Geneva Conventions and to assist the Armed Forces; and the organization receives substantial material assistance from the federal government. Like those organizations, MSSIC was created by special legislative enactment; it operates in close conjunction with the State Department of Building, Savings and Loan Associations in its routine activities; it operates under bylaws initially created by a board of directors appointed by the state and still must secure state approval of changes in the bylaws; and its accumulated income will escheat to the state upon dissolution. While many of the features are similar, there remain distinguishing features. With the post exchanges, the profits from the operations go to provide comforts for members of the armed forces; with the Red Cross, the federal government provides material assistance. In both cases the federal government has a direct financial interest in the operation of the instrumentality. Maryland has no such direct interest in the operation of MSSIC. The cost of the insurance function is borne entirely by member associations. If the income of MSSIC is insufficient to meet its liabilities, the state does not step in to meet the obligation. Under these circumstances, this court concludes that MSSIC is not performing an "essential governmental function." Thus, MSSIC's claim for exemption under section 115(a) fails on this ground also.

■ MSSIC next asserts that it is immune from federal income taxation by reason of the doctrine of intergovernmental tax immunity. According to that doctrine, since the Constitution clearly envisions a federal system, it necessarily implies that the existence of either state or federal governments should not be subjected to the control of the other by means of an extra-constitutional technique like taxation. More succinctly, as was said in M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), the power to tax is the equivalent of the power to destroy. The doctrine has no express constitutional basis, however; it is merely "implied" from the constitutional framework. While MSSIC apparently asserts that a finding that MSSIC is a state "instrumentality" necessitates a finding that it is immune from federal taxation under the doctrine, it does admit that the purpose of the doctrine is only to leave the state free of "undue" interference. The United States comes down harder on this point and asserts that a "burden" test should be used to determine the applicability of the doctrine, citing Willcuts v. Bunn, 282 U.S. 216, 51 S.Ct. 125, 75 L.Ed. 304 (1931). In Willcuts v. Bunn, the Court analyzed the burden imposed upon the state by the taxation of the profit realized by an individual taxpayer upon the sale of state bonds. Admitting that the burden imposed by taxation of the interest paid to the bondholder by the state would substantially affect the state, it concluded that the burden imposed by a tax on the profits of the private sale did not fall upon the state and denied the exemption of the income to the taxpayer. Such a "burden" analysis seems appropriate. Since the doctrine serves to protect the state from the imposition of taxes which unduly burden the state in the performance of its functions, immunity should be extended only to those situations where the state is actually hampered in its activity. The state of Maryland is not

so "burdened" by the imposition of federal tax on the income of MSSIC. The sole source of the capital which produces the income taxes is the contribution by the private savings and loan associations which seek coverage. The state of Maryland makes no financial contribution to which the income may be attributed. Moreover, the state of Maryland has no present interest in the income which accumulates. It is only upon dissolution of MSSIC and escheat to the state that the income in question accrues to the state. Until that time accumulated income is applied to pay the expenses and to meet the liabilities of MSSIC. Under the circumstances, the tax cannot be said to impose a burden on the state of Maryland. Therefore, MSSIC's claim for a refund based on the doctrine of intergovernmental tax immunity fails.

Finally, MSSIC claims that to deny it exemption from federal income tax is a denial of due process under the Fifth Amendment in light of the fact that essentially identical corporations are exempt under the Internal Revenue Code section 501(c) (14). Section 501(c) (14) provides that the following are included in the tax exemption provisions of section 501(a):

> (B) Corporations or associations without capital stock organized before September 1, 1957, and operated for mutual purposes and without profit for the purpose of providing reserve funds for, and insurance of shares or deposits in—
>
> > (i) domestic building and loan associations,
> >
> > (ii) cooperative banks without capital stock organized and operated for mutual purposes and without profit, or
> >
> > (iii) mutual savings banks not having capital stock represented by shares.

Since MSSIC was created after the September 1, 1957, cutoff date, it does not qualify for exemption even though it is otherwise within the requirements of the section. MSSIC asserts, however, that cutting off the exemption at September, 1957, is arbitrary and capricious and constitutes a denial of due process.

The law on the restrictions placed on the taxing power by the Fifth Amendment due process requirement is aptly summarized in Smart v. United States, 222 F. Supp. 65, 67 (S.D.N.Y.1963), aff'd, 332 F.2d 283 (2d Cir. 1964):

> In the case of the fifth amendment, although there is no equal protection clause, an arbitrary and unreasonable classification would constitute a violation of due process. Steward Machine Co. v. Davis, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937). It is therefore necessary to consider the reasonableness of the classification imposed here.

> The Supreme Court has held repeatedly that inequalities resulting from a singling out of a particular class for taxation or exemption do not infringe any constitutional limitation. The Congress may make distinctions having a rational basis, and "when subjected to judicial scrutiny they must be presumed to rest on that basis if there is any *conceivable state of facts* which would support it." Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245 (1937).

> It has been said that Congress has the widest powers of selection and classification and that its use of these powers will be considered unreasonable only where the classification is so arbitrary as to have no reasonable basis. Abney v. Campbell, 206 F.2d 836 (5th Cir. 1953). (emphasis supplied)

MSSIC claims that the effect of section 501(c) (14) is to exempt two funds substantially identical to MSSIC, the Cooperative Central Bank (Massachusetts) and the Ohio Deposit Guaranty Fund. It asserts that there is no reasonable basis for the 1957 cutoff and that the cutoff is so discriminatory as to deny MSSIC due process.

MSSIC is essentially identical to the Ohio Deposit Guaranty Fund. Both are

managed by a board of directors who are elected by the member associations. Three of the directors of MSSIC are appointed by the governor, while none of the directors of the Ohio corporation are chosen by the governor. Both funds are capitalized by the deposit by member associations of two percent of their outstanding accounts, which amount is adjusted semiannually. Both rely on state regulatory agencies for reports of examinations of member associations. The Maryland corporation does differ in some respects. The Maryland corporation cannot accept a member unless it is first approved by the Maryland State Department of Building, Savings and Loan Associations. The Ohio fund can accept any applicant without such state approval. Changes in the bylaws and regulations of the Maryland corporation must be submitted for state approval. Such changes in the Ohio fund are not supervised. While both funds are currently voluntary, membership in the Maryland corporation becomes mandatory for those not otherwise insured by 1973. The Maryland fund is specifically exempt from state taxation. The Ohio fund has no such exemption. Testimony indicated that, in all other respects, the operations of MSSIC and the Ohio fund are identical. Apparently the only difference between the two is the date of incorporation.

The legislative history of section 501 (c) (14) does not reveal the reason the exemption was granted. Prior to 1951 the entire mutual savings bank and savings and loan industries were exempt under the Internal Revenue Code from tax on the income of their operations. In 1951 the decision was made that the purpose of the exemption, to afford savings institutions which had no capital stock the benefit of tax exemption so that a surplus could be accumulated to provide the depositors with greater security on their deposits, was no longer applicable. The industries had developed to the point where the ratio of capital account to total deposits was comparable to that of commercial banks, which did not have an exemption. Therefore, the exemption for the mutual banks and the savings and loan associations was discontinued. *See* S. Rep. No. 781, 82d Cong., 1st Sess., 2 U.S. Code Cong. & Admin.Serv. 1991–1997 (1951). While the exemption for the mutual banks and savings and loan associations was discontinued, the exemption for nonprofit corporations which insured those organizations was carried forward as section 501(c) (14). While the reason for discontinuing the exemption of mutual banks and savings and loan associations does appear in the committee report, the reason for continuing the exemption for insurers does not appear. The exemption carried forward, however, was qualified by adding a cutoff date of September 1, 1951. Insurers not organized before that date did not qualify for the exemption. Revenue Act of 1951, ch. 521, § 313b, 65 Stat. 490. In 1960 the cutoff date was changed from September 1, 1951, to September 1, 1957. Act of April 22, 1960, Pub. L. 86–428, § 1, 74 Stat. 54. Senate Report No. 1034 of the Committee on Finance, recommending that the cutoff be moved forward, indicates that the purpose for bringing the cutoff date forward was to enable the Ohio Deposit Guaranty Fund to qualify for the exemption. The report states the following:

Under present law an exemption from income tax is provided for nonprofit, mutual organizations having no capital stock which are operated for the purpose of providing reserve funds for, and insurance of, shares or deposits in domestic building and loan associations, cooperative banks, or mutual savings banks. However, in order to be exempt these organizations also must have been organized before September 1, 1951. * * *

There are four such organizations now in existence: Two in Massachusetts, one in Connecticut, and one in Ohio. * * *

* * * Three of the four private organizations providing essentially the same services for their members

* * * are exempt because they were organized before September 1, 1951, the approximate time when the exemption for these organizations was added to the law. Because the guarantee organization in Ohio, although performing the same services, was organized after that date it is presently denied exemption.

Your committee's bill corrects this discrimination by moving forward from September 1, 1951, to September 1, 1957, the date before which these guarantee funds must have been organized in order to obtain income tax exemption.

S. Rep. No. 1034, 86th Cong., 2d Sess., 2 U.S. Code Cong. & Ad. News, 1873–1874 (1960). In a letter from the office of the Secretary of the Treasury to the Finance Committee, favorably reporting on the bill changing the cutoff, an assistant secretary does note the reason the original cutoff was included in the 1951 version. Letter from Jay W. Glasman to Harry F. Byrd, Jan. 20, 1960, 2 U.S. Code Cong. & Ad. News, 1874–1875 (1960). The letter indicates that counsel for the two Massachusetts insurance organizations which gained an exemption under the bill drafted the original exemption provision and that they included a cutoff date so that it could be represented that the revenue effects of the bill would be limited. The United States points out that the reason the cutoff was brought forward to 1957 was that the 1951 attempt to remove the exemption for savings and loan associations was circumvented by the associations and that the loophole was only effectively closed by the Revenue Act of 1962. Given the fact that the Ohio corporation had, like the corporations organized before September 1, 1951, been organized during a period when the savings and loans themselves were essentially not taxed, it was only fair to extend the same exemption to the Ohio corporation that was enjoyed by those who were organized before the original attempt to tax the savings and loans. Thus the 1957 cutoff does serve to extend the exemption only to those who were organized at a time when the savings and loan associations were virtually not taxed. While the decision to cut off an exemption as to all similarly situated corporations would be clearly within Congress' prerogative, the question presented here is whether due process requires Congress to choose between opening or closing the exemption for all non-profit corporations similarly situated, rather than discriminating between them solely on the basis of date of incorporation when the sole purpose for that incorporation classification is to afford exemption to a few while securing the flow of revenue from others.

The Supreme Court has dealt with challenges to classifications made by Congress in the exercise of its taxing power. See Fernandez v. Wiener, 326 U.S. 340, 66 S.Ct. 178, 90 L.Ed. 116 (1945); Heiner v. Donnan, 285 U.S. 312, 52 S.Ct. 358, 76 L.Ed. 772 (1932); Blodgett v. Holden, 275 U.S. 142, 276 U.S. 594, 48 S.Ct. 105, 72 L.Ed. 206 (1927), modified, 276 U.S. 594 (1928); Nichols v. Coolidge, 274 U.S. 531, 47 S.Ct. 710, 71 L.Ed. 1184 (1927); National Paper & Type Co. v. Bowers, 266 U.S. 373, 45 S.Ct. 133, 69 L.Ed. 331 (1924); Barclay & Co. v. Edwards, 267 U.S. 442, 45 S.Ct. 348, 69 L.Ed. 703 (1924); Brushaber v. Union P.R.R., 240 U.S. 1, 36 S.Ct. 236, 60 L.Ed. 493 (1916). None of these cases is analogous, however. Of those cases, only three actually held the classification in question to be so arbitrary as to constitute a denial of due process. Nichols v. Coolidge, 274 U.S. 531, 47 S.Ct. 710, 71 L.Ed. 1184 (1927), and Blodgett v. Holden, 275 U.S. 142, 48 S.Ct. 105, 72 L.Ed. 206 (1927), both deal with the problem of the propriety of taxing a transfer not subject to taxation at the time it was made. In Nichols v. Coolidge, the transfer was a conveyance of real property, a gift, made in 1917 but, due to the retention of possession, arguably not completed until the grantor's death in 1921. The tax on the gift as a transfer made at death under a

statute passed in 1919 was declared to violate due process. Blodgett v. Holden involved the question of taxing a gift made in January, 1924, under a statute passed in June, 1924, providing for the taxation of all such transfers made during 1924 and thereafter. The tax was held to violate due process. Heiner v. Donnan, 285 U.S. 312, 52 S.Ct. 358, 76 L.Ed. 772 (1932), held that the conclusive presumption that transfers without consideration and made within two years of the death of the donor were "in contemplation of death" and therefore subject to taxation under the estate tax violated due process. Fernandez v. Wiener, 326 U.S. 340, 66 S.Ct. 178, 90 L.Ed. 116 (1945), held that taxing community property as if it were entirely the property of the husband was not so arbitrary as to violate due process because the effect of the classification was that the tax burden placed on citizens of community-property states more nearly resembled that placed on citizens of non-community-property states. Brushaber v. Union P.R.R., 240 U.S. 1, 36 S.Ct. 236 (1916), involved an attack on the progressive feature of the income tax on individuals, on various features of tax on the interest on corporate indebtedness, on the limitation on the deduction permitted for interest paid by a corporation, on the denial to corporations of the deduction of dividend income enjoyed by individuals, on distinctions between single and married taxpayers, and on the failure to impute income to homeowners on the rental value of their homes. The Court found that there were adequate bases for the classifications attacked. Similarly, there was an adequate basis for the distinction between foreign and domestic corporations with respect to sales in foreign countries, which was in issue in National Paper & Type Co. v. Bowers, 266 U.S. 373, 45 S.Ct. 133, 69 L.Ed. 331 (1924). The same distinction was involved in Barclay & Co. v. Edwards, 267 U.S. 442, 45 S.Ct. 135, 69 L.Ed. 703 (1924). Thus, while the proposition that the Fifth Amendment restricts the exercise of the taxing power seems firmly established, there are no Supreme Court cases dealing with the application of the principle to a "grandfather clause" like that involved here.

The United States claims that date of incorporation is an appropriate basis for classification. It asserts that MSSIC might have a valid due process claim if it had been in existence at the time the exemption was granted and had been denied the exemption at the same time it was extended to others. It argues, however, that, that not being the case, the classification on the basis of date of incorporation is within the latitude permitted Congress. MSSIC argues to the contrary citing Mayflower Farms v. Ten Eyck, 297 U.S. 266, 56 S.Ct. 457, 80 L.Ed. 675 (1936). That case dealt with the problem of a discrimination based on date of organization and found it to be a denial of equal protection under the Fourteenth Amendment. In *Mayflower Farms*, a New York Milk Control Act went into effect for one year on March 31, 1933. Mayflower Farms entered the business as a milk dealer in the fall of 1933. The act regulated the price at which milk could be sold. It distinguished between brands which were "well advertized" and those which were not. Dealers not having a well advertized brand could sell one cent per quart below the price charged by dealers having well advertized brands. In 1934 when the act was renewed, the advantage of selling at one cent below advertized brand price was denied to any dealer who was not in business as of April 10, 1933. In the absence of a showing of the reason for the classification, the Court held it to be a denial of equal protection. The *Mayflower Farms* case, while dealing with a date of organization classification, contains the added fact that the organization was in existence at the time the discriminatory classification was made. As the United States points out, that element is not present in MSSIC's case. Moreover, the question of the relative scope of the Fifth Amendment "due process" with respect to Fourteenth Amendment "equal protection"

is raised when one seeks to apply the principle therein to the present case. While the United States is correct in its assertion that Mayflower Farms v. Ten Eyck is distinguishable on those grounds, this court is impressed with the fact that a cutoff date in a legislative enactment was subjected to judicial scrutiny and found to be a denial of equal protection.

In summary then, the situation is this. Congress has granted a tax exemption to a few mutual, non-profit insurers of savings and loan associations and denied that exemption to substantially identical corporations. Functionally those corporations would seem to constitute a single class. Congress, however, has divided them into two classes. Those created before 1957 are of a class that is not taxed; those created after that date are of a class that is taxed. It is clear that Congress, having created a tax exemption as to an otherwise taxable entity, can remove that exemption whenever it wishes and that no showing of a reason other than the desire to obtain revenue would be required by this court before it would uphold Congress' action. However, even in matters which are clearly within Congress' prerogative, distinctions which are drawn must have a rational basis. No reason whatsoever, much less a reasonable one, appears for the discrimination between members of the class of mutual, nonprofit insurers created before 1957 and those created after 1957; nor can this court find any conceivable basis in fact for that discrimination. If there were, for example, a regulatory purpose incidental to the revenue purpose of section 501(c) (14), then this court would uphold Congress' action; but no such regulatory purpose appears. In a letter to Wilbur D. Mills, chairman of the House Ways and Means Committee, stating the Treasury's position on a bill which would have moved the cutoff date in section 501(c) (14) forward to 1963 and thus afforded exemption to MSSIC, the Assistant Secretary, Stanley S. Surrey, concluded, as this court concludes, that "[s]ince organizations performing functions similar to those to be performed by the Maryland Savings-Share Insurance Corporation are now tax exempt, considerations of non-discrimination may warrant extending the exemption to the Maryland Corporation." Letter from Stanley S. Surrey to Wilbur D. Mills, Aug. 3, 1962, attached to the complaint as exhibit "C". This court concludes that cutting off the exemption at the 1957 date is arbitrary and a denial of the Maryland Savings-Share Insurance Corporation's right to due process.

Accordingly, the clerk will enter a judgment in favor of the Maryland Savings-Share Insurance Corporation against the United States in the sum of $40,898.02 together with interest as provided by law.