*Decisions will be entered under Rule 155.*

TROY STATE UNIVERSITY, PETITIONER *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 7516–72. Filed July 9, 1974.

*James M. Scott*, for the petitioner.
*Roy S. Fischbeck*, for the respondent.

OPINION

TIETJENS, *Judge:* The Commissioner determined that Troy State University (hereafter petitioner) is liable for $5,559.26, plus interest, as transferee of assets of Beard Memorial Hospital, Inc. (hereafter transferor), for the taxable period March 1, 1966, to October 1, 1966.

The issue for decision is whether amounts treated as gain under section 1245 [1] are excludable from transferor's gross income by reason of either section 115(a)(1) or constitutional limitations on the Federal power to tax State instrumentalities.

This case was fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The facts which we deem necessary for decision will be referred to below.

From 1957 to 1967, petitioner was an Alabama educational institution named Troy State College, managed and controlled by the State board of education of Alabama as provided in section 438 of title 52 of the Alabama Code.[2] By legislative enactment in 1967, section 509 (116) of title 52, petitioner was placed under the exclusive jurisdiction, supervision, and control of a board of gubernatorially appointed trustees of which the Governor and the State superintendent of education were ex-officio members, and was renamed Troy State University. When the petition in this case was filed, petitioner's principal place of business was Troy, Ala.

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise stated.

[2] From 1957 to 1967, ch. 21 of tit. 52 of the Alabama Code provided in part as follows:

Sec. 438 Control.—The state board of education shall have the control and management of the several teachers' colleges of the state, for white teachers, located at Florence, Jacksonville, Livingston, Troy, and of the Alabama State College for Negroes located at Montgomery. (1927 School Code, Sec. 474; 1949, p. 374, Sec. 1, appvd. July 18, 1949.)

Sec. 439 Rules for government; president and faculty.—The state board of education, upon the recommendation of the state superintendent of education, shall make rules and regulations for the government of the schools and shall elect the president of each of the several schools, and upon such president's recommendations the members of the faculties, and shall fix the tenure and salary of each. (1927 School Code, Sec. 475.)

Sec. 440 Extension work.—The state board of education, upon the recommendation of the state superintendent of education, shall prescribe the courses of study to be offered and the extension work to be done by the several teachers' colleges and the conditions for granting certificates, diplomas and degrees. (1927 School Code, Sec. 476; 1949, p. 374, Sec. 2, appvd. July 18, 1949.)

Sec. 441 Expenditure of appropriation.—The state board of education is charged with the responsibility of directing the expenditure of the annual legislative appropriations for the support and maintenance of the white teachers' colleges located at Florence, Jacksonville, Livingston, Troy and of the Alabama State College for Negroes located at Montgomery. The state board of education is further charged with the responsibility of expending all special appropriations made to any or all of the above institutions, and of seeing that the conditions prescribed in the acts making the appropriations are fully complied with. (1927 School Code, Sec. 477; 1949, p. 374, Sec. 3, appvd. July 18, 1949.)

Transferor was organized and incorporated as an Alabama corporation on May 1, 1948. At all times relevant to this proceeding its principal business place was Troy, Ala., and its only business activity was holding and renting hospital facilities to James O. Colley, Jr. (hereafter Colley), and William P. Stewart (hereafter Stewart), who were physicians and equal copartners doing business as Beard Hospital and who owned equally all issued and outstanding stock of the transferor. These hospital facilities, which constituted all transferor's noncash assets, consisted generally of a hospital building and lot, a nurses home and lot, hospital equipment, fixtures, and furniture.

Included as part of the hospital equipment were air-conditioners, X-ray machines, heaters, nurse call and antenna systems, and similar equipment incidental to the operation of a hospital and nurses home. Included as part of the fixtures were an elevator, a furnace, and air-conditioner. Included as part of the furniture were sundry furnishings incidental to the operation of a hospital and nurses home.

On September 26, 1966, Colley and Stewart sold and transferred all issued and outstanding stock of transferor to petitioner. The transaction was part charitable contribution, part sale.

On October 1, 1966, in what petitioner deemed to be an appropriate exercise of its duties, petitioner caused the transferor to be liquidated and to distribute all of its assets to petitioner and cancel all of its stock.

The transferor's Federal income tax return for the period March 1 to October 1, 1966, was filed with the district director of internal revenue, Birmingham, Ala. The return was designated "Final Return."

The assets transferred and distributed by the transferor to petitioner consisted of the same assets described above, of which the hospital equipment and the furniture and fixtures were of a type described in section 1245(a)(3), and approximately $28,000 cash. By reason of the liquidation, petitioner was the actual transferee of all assets of transferor.

The fair market values of the hospital equipment and of the furniture and fixtures transferred and distributed by transferor to petitioner, as of October 1, 1966, were $30,000 and $10,000, respectively. The adjusted bases to transferor of the distributed hospital equipment and the furniture and fixtures, as of October 1, 1966, were $16,743.99 and $2,961.46, respectively. As of October 1, 1966, depreciation claimed and allowed to transferor after December 31, 1961, with respect to the distributed hospital equipment and the furniture and fixtures totaled $37,153.33 and $6,330.94, respectively.

On October 1, 1966, petitioner leased all the distributed assets back to Colley and Stewart for a term of 2 years, with a 1-year renewal option, at an annual rent of $20,000. Rent paid by Colley and Stewart

to petitioner during the term of this lease to June 30, 1969, totaled $53,333.12. Under this lease, the hospital remained open for the general public until Troy's new municipal hospital was completed, at which time Stewart and Colley ceased leasing the facility. Subsequently, the facility has been used by the petitioner.

On its Federal income tax return for the period March 1 to October 1, 1966, transferor reported no section 1245 gain or loss with respect to the transfer and distribution of the personal property.

In his statutory notice of deficiency, the Commissioner determined that transferor realized taxable income in the amount of $19,586.95 during the tax year March 1 to October 1, 1966, from disposition of section 1245 property. Having distributed all assets in the liquidation, transferor had thereafter no funds for the payment of Federal income tax if any is determined in this proceeding to be due. The Commissioner determined against petitioner, as transferee, the deficiency, plus interest thereon as provided by law, in income tax of transferor for the tax year March 1 to October 1, 1966. The fair market value of the assets transferred by the transferor to petitioner is in excess of that deficiency, plus that interest as provided by law.

Petitioner argues that, although section 1245 treated certain amounts as gain upon the liquidation of the transferor, that gain is excludable from the transferor's gross income under section 115(a)(1). Petitioner cites section 1.1245–6(e), Income Tax Regs., which states that the provisions of section 1245 do not "change into taxable income any income which is exempt under section 115." In addition, petitioner argues that the United States Constitution impliedly prohibits the tax determined by the Commissioner because it is a tax imposed on an instrumentality of the State of Alabama.

Section 115(a)(1) excludes from gross income—

income derived from any public utility or the exercise of any essential governmental function and accruing to a State or Territory, or any political subdivision thereof, or the District of Columbia.

Petitioner argues, as we understand it, that the section 1245 gain "accrued" to the State of Alabama through petitioner and that the transferor exercised an "essential governmental function."

Senate Report No. 80, 63d Cong., 1st Sess. (1913), 1939–1 C.B. (Part 2) 4, suggests that Congress intended "accrual" only when a State was in "receipt of income" as when, for example, payment was received under contract. See also the Senate debates, 50 Cong. Rec. 5320 (1913). The Board of Tax Appeals has said that the language "was intended to exempt * * * [a State or political subdivision] from taxation upon income which it actually receives." *Citizens' Water Co.*, 32 B.T.A. 750, 753 (1935), affd. 87 F. 2d 874 (C.A. 8, 1937), certiorari denied 302 U.S. 694 (1937). The Eighth Circuit has said that Congress

intended "the legal definition of the word 'accrue'," which requires a vested right or an enforceable claim. *Omaha Public Power District* v. *O'Malley*, 232 F. 2d 805, 809 (C.A. 8, 1956), certiorari denied 352 U.S. 837 (1956). The requirement that income accrue to a State is not satisfied when income or a benefit merely "inures" to a State or when unused earnings may, at some future time, accrue to a State. *Omaha Public Power District* v. *O'Malley, supra* at 809; *Citizens' Water Co., supra* at 754; *Nebraska-Iowa Bridge Corp.* v. *McCrory*, an unreported case (D. Neb. 1959, 4 A.F.T.R. 2d 5552, 59–2 U.S.T.C. par. 9679).

Because a corporation is considered a legal entity separate from its shareholders, the earnings of a corporation do not accrue directly to its shareholders. Accordingly, when a corporation is owned by a State or political subdivision, its earnings do not "accrue" to that State or subdivision even if dividends have been declared. *Bear Gulch Water Co.*, 40 B.T.A. 1281 (1939), affd. 116 F. 2d 975 (C.A. 9, 1941), certiorari denied 314 U.S. 652 (1941); *Citizens' Water Co., supra; Town of Fairhaven, Mass.* v. *United States*, 135 Ct. Cl. 782, 142 F. Supp. 590 (1956).

These general principles and the cases from which they are drawn indicate that any earnings of the transferor would not have been excluded from its gross income by section 115(a)(1). However, it is arguable that the fact that the transferor's tax liability resulted from its liquidation distinguishes the instant case from those cases cited above. In other words, it is arguable that, at the time the transferor "disposed of" its property through liquidation so as to fall within the provisions of section 1245, petitioner received all of the assets of the transferor and that, at that time, any amounts treated as gain by section 1245 belonged and "accrued" to petitioner.

Such an analysis, however, does not seem consistent with the congressional intent regarding sections 1245 and 115. Section 1245 was enacted to diminish the effect of certain depreciation deductions on taxable income. The House Report No. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 470–471, explains the situation which section 1245 was intended to eliminate:

Under present law, in the case of depreciable property the taxpayer may write off the cost or other basis of the property over the period of the useful life of the asset in his hands. This cost or other basis can be written off evenly (or in a 'straight line' over the asset's life), under the declining balance method, under the sum-of-the-year's digits method, or under any other consistent method which does not during the first two-thirds of the useful life of the property exceed the allowances which would have been allowed under the declining balance method. This depreciation deduction is a deduction against ordinary income. If either the useful life of the asset is too short, or the particular method of depreciation allows too much depreciation in the early years, the decline in value of the asset

resulting from these depreciation deductions may exceed the actual decline of the value of the asset. Wherever the depreciation deductions reduce the basis of the property faster than the actual decline in its value, then when it is sold there will be a gain. Under present law this gain is taxed as a capital gain, even though the depreciation deductions reduced ordinary income. The taxpayer who has taken excessive depreciation deductions and then sells an asset, therefore, has in effect converted ordinary income into a capital gain.

To correct this situation, section 1245 attempts to "recapture" excessive deductions taken against ordinary income which "accrued" over the period a depreciable asset was held. It attempts to recapture deductions taken against income by the transferor in the years Colley and Stewart were shareholders of the transferor and before the transferor was sold to the State. Those were the only years in which the transferor was "in receipt of income" within the language of the 1913 Senate report. Moreover, by explicitly subjecting liquidations to the operation of section 1245, H. Rept. No. 1447, 1962–3 C.B. at 475; S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 805, Congress directed that the liquidating corporation, the party which "disposed of" the assets, rather than its shareholders, should recognize gain. In this way, section 1245 attributes a constructive "receipt of income" to the transferor, a legal entity separate from petitioner, and suggests that income has "accrued" to the transferor and not to petitioner.

We also note that section 21(86) of title 10 of the Alabama Code provides in part as follows:

Corporations whose charters have expired, or which have been dissolved otherwise than by judicial decree, continue to exist as bodies corporate for a period of five years after such dissolution for the purpose of prosecuting or defending suits, settling their business and affairs, collecting and disposing of their properties and distributing their assets, but not for the purpose of continuing their business. The directors of such corporations shall be trustees thereof, with full power to settle their business and affairs, collect and pay their debts, sell and convey their properties, prosecute and defend suits, make distribution to stockholders or other persons entitled thereto and to do all things reasonable and necessary to bring about an orderly liquidation and settlement of the business and affairs of the corporations. Suits may be brought and property may be conveyed by such trustees or a majority of them in the name of the corporation. * * *

See *Railway Fuel Co.* v. *Ackerman*, 269 Ala. 460, 114 So. 2d 142 (1959). Similarly, if property of a dissolved corporation has been distributed to stockholders, the stockholders "become quasi-trustees of such property, and subject to the equitable rights of * * * creditors [of the corporation] to subject it to their debts." *Kelly* v. *Andalusia Brick Co.*, 222 Ala. 203, 131 So. 559, 560 (1930). See also *Boothton Coal Min. Co.* v. *Tennessee Coal, Iron & R. Co.*, 257 Ala. 705, 60 So. 2d 833 (1952); *King* v. *Coosa Valley Mineral Products Co.*, 283 Ala. 197, 215 So. 2d 275 (1968).

These provisions suggest that, for certain purposes, the transferor's

existence continued beyond October 1, 1966, the date of liquidation, and that its assets were held by petitioner as a "quasi-trustee." Transferor's shell was not, as petitioner suggests, entirely shed. The continuation of transferor refutes petitioner's argument that, unlike the "operating" company involved in *Bear Gulch Water Co.*, *supra*, transferor was not an entity separate from petitioner. Moreover, the corporate continuation of transferor supports our conclusion that income attributed to the transferor under section 1245 did not necessarily "accrue" to petitioner upon liquidation of the transferor.[3]

Even if we were to hold that the section 1245 gain "accrued" to petitioner, we could not hold that that gain was "derived from * * * the exercise of any essential governmental function." Although few cases have attempted to define "essential governmental function" as used in section 115(a)(1) and its predecessors, that language has been pivotal in numerous cases determining what activities are constitutionally exempt from Federal taxation. See, for example, *Allen* v. *Regents*, 304 U.S. 439, 452 (1938), rehearing denied 304 U.S. 590 (1938); *Brush* v. *Commissioner*, 300 U.S. 352, 362 (1937); *Flint* v. *Stone Tracy Co.*, 220 U.S. 107, 172 (1911). In fact, the requirement that income be "derived * * * from the exercise of any essential governmental function" contained in the Tariff Act of October 3, 1913, section IIG(a), the language of which is almost identical to that of section 115(a)(1), appears to have reflected the constitutional distinction between governmental, exempt activities and proprietary, nonexempt activities. See *Flint* v. *Stone Tracy Co.*, *supra* at 172, where the Supreme Court made the following statement:

> It is no part of the essential governmental functions of a State to provide means of transportation, supply artificial light, water and the like. These objects are often accomplished through the medium of private corporations, and, though the public may derive a benefit from such operations, the companies carrying on such enterprises are, nevertheless, private companies, whose business is prosecuted for private emolument and advantage. For the purpose of taxation they stand upon the same footing as other private corporations upon which special franchises have been conferred.
>
> The true distinction is between the attempted taxation of those operations of the States essential to the execution of its governmental functions, and which the State can only do itself, and those activities which are of a private character. The former, the United States may not interfere with by taxing the agencies of the State in carrying out its purposes; the latter, although regulated by the State, and exercising declared authority, such as the right of eminent domain, are not removed from the field of legitimate Federal taxation.

---

[3] Because we conclude that the sec. 1245 gain did not "accrue" to petitioner, we need not decide whether an accrual to petitioner would represent an accrual to the State of Alabama as required by sec. 115(a)(1). We need not determine whether, under the statutes establishing petitioner, ownership of the transferor's stock by petitioner "is tantamount to ownership thereof by the State of" Alabama. *Bear Gulch Water* Co., 40 B.T.A. at 1287.

See also *South Carolina* v. *United States*, 199 U.S. 437, 461 (1905), where the Court limited the constitutional exemption to instrumentalities "of a strictly governmental character." [4]

An analysis of those cases dealing with constitutional limitations on the Federal taxation of essential governmental functions indicates that the transferor's section 1245 gain was not derived from such a function. We cannot accept petitioner's argument that, because the liquidation of the transferor to allow petitioner to lease the hospital assets was an activity to support an educational institution, the transferor performed an essential governmental function. See *Allen* v. *Regents*, 304 U.S. at 452, where the Court said:

If it be conceded that the education of its prospective citizens is an essential governmental function of Georgia, as necessary to the preservation of the State as is the maintenance of its executive, legislative, and judicial branches, it does not follow that if the State elects to provide the funds for any of these purposes by conducting a business, the application of the avails in aid of necessary governmental functions withdraws the business from the field of federal taxation.

Nor can we accept petitioner's argument that liquidation of transferor was an essential governmental function because it was essential to petitioner's rental of the assets without stockholders "various dividend procedures," and a "myriad of miscellaneous returns and forms required of a separate corporation." Liquidation may have been essential to avoid what petitioner calls an "expensive, inconvenient, artificial arrangement," but avoiding such an arrangement was not essential to the functioning of a State government. [5]

---

[4] In *Brush* v. *Commissioner*, 300 U.S. at 362, the Court said that the modifying words "essential," used in *Flint* v. *Stone Tracy Co.*, 220 U.S. at 172, "strictly," used in *South Carolina* v. *United States*, 199 U.S. at 461, and "usual," used in *Helvering* v. *Powers*, 293 U.S. 214, 225 (1934), "must not be too literally contradistinguished." Nevertheless, for purposes of construing sec. 115(a)(1), it is significant that, in *Flint* v. *Stone Tracy Co.*, decided in 1911, the Court spoke of exempting "essential governmental functions."

The language also appears in Regs. 69, under the 1926 Revenue Act, art. 88, which exempts from tax "Compensation paid to its officers and employers by a State or political subdivision thereof for services rendered in connection with the exercise of an essential governmental function of the State or political subdivision." Similar language appears in art. 643, Regs. 74 (1928 Act) ; Regs. 77, art. 643 (1932 Act) ; Regs. 86, art. 116-2 (1934 Act) ; and Regs. 94, art. 116-2 (1936 Act). In *Helvering* v. *Powers, supra* at 224, the Court said that the Treasury Department could not by these regulations "either limit the provisions of the statute or define the boundaries of their constitutional application," but the Court concluded, 293 U.S. at 227, that the operation of a street railway was not one of the "usual governmental functions" immune from Federal taxation. In *Helvering* v. *Gerhardt*, 304 U.S. 405, 422 (1938), rehearing denied 305 U.S. 669 (1938), the Court suggested that those regulations were not constitutionally required and that the Court's decision in *Brush* v. *Commissioner* was based on the regulations rather than the Constitution. Despite these suggestions, *Brush* v. *Commissioner* appears to be based on constitutional considerations. See the Court's reliance on *Collector* v. *Day*, 11 Wall. 113 (1870), 300 U.S. at 364, and the concurrence of Justices Stone and Cardozo, 300 U.S. at 374. See also Mim. 3838 (revised), 1938-1 C.B. 182, declared obsolete by Rev. Rul. 67-406, 1967-2 C.B. 422.

[5] See *Helvering* v. *Therrell*, 303 U.S. 218, 225 (1938), in which the Supreme Court held that the liquidation of an insolvent corporation by a State officer was not an activity of "the State in the discharge of her essential governmental duties."

The petitioner and Commissioner have stipulated that the transferor's "only business activity was holding and renting hospital facilities" to Colley and Stewart. Therefore the central question is whether such an activity is an essential governmental function. Under certain circumstances, the operation of a hospital may be such a function. *Walter S. Goodale*, 34 B.T.A. 697 (1936) ; *Mallory* v. *White*, 8 F. Supp. 989 (D. Mass. 1934) ; Mim. 3838 (revised), 1938–1 C.B. 181, 186, declared obsolete by Rev. Rul. 67–406, 1967–2 C.B. 420, 422. Courts have held that, under other circumstances, operation of a hospital is not an essential governmental function. *Liggett & Myers Tobacco Co.* v. *United States*, 13 F. Supp. 143 (Ct. Cl. 1936), affd. 299 U.S. 383 (1937), rehearing denied 300 U.S. 686 (1937) ; *Cook* v. *United States*, 26 F. Supp. 253 (D. Mass. 1939).

From 1948 to 1966, the transferor was owned by Colley and Stewart, private citizens, and held and rented hospital facilities to its two shareholders. Apparently, these shareholders rather than the transferor operated the hospital. After the liquidation of the transferor in 1966, petitioner continued to lease the facilities to Colley and Stewart. Thus, during these relevant periods, the petitioner did not really maintain a hospital in the sense that the City of Boston, Mass., "established and maintained" a hospital in *Mallory* v. *White, supra* at 992.

Petitioner has not argued that any statute required it to provide hospital services, that the hospitals were required to treat certain patients without charge, or that the hospital was charitable or devoted to the insane. *Walter S. Goodale, supra; Cook* v. *United States, supra;* Mim. 3838, *supra.* We find no reason to consider transferor's operation one which is "essential to the execution of * * * [the State's] governmental functions, and which the State can only do itself." *Flint* v. *Stone Tracy Co.*, 220 U.S. at 172; *Liggett & Myers Tobacco Co.* v. *United States, supra* at 145.[6]

Petitioner's contention that it and transferor are exempt from taxa-

---

[6] Our conclusion that the transferor's sec. 1245 gain is not excludable under sec. 115 (a)(1) is supported by *Maryland Savings-Share Insurance Corp.* v. *United States*, 308 F. Supp. 761 (D. Md. 1970), reversed on another issue 400 U.S. 4, 7 (1970), where, in fn. 2 to its opinion, the Supreme Court said that the District Court "properly rejected" the taxpayer's claim for exemption under sec. 115(a)(1). In that case, 308 F. Supp. at 765, the District Court used the following approach to sec. 115 :

"the determination that the section 115(a) exemption should be extended to a taxpayer requires a weighing of how central the activity sought to be taxed is to the operation of state government and of how directly taxation of the income of the activity will burden the state treasury."

Since the parties have not stipulated the price petitioner paid for the transferor's stocks, we cannot determine to what extent petitioner deemed transferor's activity "central * * * to the operation of state government" by determining to what extent petitioner was willing to "lay its money on the line" to acquire the transferor. (308 F. Supp. at 766.) Moreover, because, as the parties stipulate, the transfer of stock was "part charitable, part sale," we conclude that Colley and Stewart could have absorbed the transferor's tax liability so as to relieve petitioner and the State treasury of any tax "burden."

tion under constitutional limitations on the Federal taxing power rests on the following language from *Helvering* v. *Therrell*, 303 U.S. 218, 223 (1938) : "the United States may not tax instrumentalities which a State may employ in the discharge of her essential governmental duties." Similar principles are expressed by the Supreme Court in numerous cases, including *South Carolina* v. *United States*, *supra; Flint* v. *Stone Tracy Co.*, *supra;* and *Brush* v. *Commissioner*, *supra.* However, these cases cannot provide tax immunity to the transferor since, as we have concluded in our discussion above, the transferor was not engaged in an essential governmental function.

In *Helvering* v. *Gerhardt*, 304 U.S. 405, 419–420 (1938), rehearing denied 305 U.S. 669 (1938), the Supreme Court discussed "two guiding principles of limitation for holding the tax immunity of State instrumentalities to its proper function." One of these principles :

excludes from the immunity activities thought not to be essential to the preservation of state governments even though the tax be collected from the state treasury. * * * The other principle, exemplified by those cases where the tax laid upon individuals affects the state only as the burden is passed on to it by the taxpayer, forbids recognition of the immunity when the burden on the state is so speculative and uncertain that if allowed it would restrict the federal taxing power without affording any corresponding tangible protection to the state government; even though the function be thought important enough to demand immunity from a tax upon the state itself, it is not necessarily protected from a tax which well may be substantially or entirely absorbed by private persons. * * *

Even if the transferor were engaged in an essential governmental function, we should conclude that because of the second principle enunciated in *Helvering* v. *Gerhardt, supra*, petitioner is not entitled to constitutional immunity. Because, as the parties have stipulated, the transfer of stock to petitioner was "part charitable, part sale," Colley and Stewart could have absorbed any tax for which the transferor would have been liable upon its liquidation. In this way, the tax on the section 1245 gain could be "substantially or entirely absorbed by private persons" and any burden on the State of Alabama is "speculative and uncertain." See also *Wilmette Park Dist.* v. *Campbell*, 338 U.S. 411, 419 (1949).

In its petition, petitioner alleged that the "Commissioner erred in asserting a transferee liability on * * * [petitioner], as there was no direct tax liability on the transferor." In its brief, petitioner does not argue that it is not liable as transferee for any tax owned by the transferor. However, in part of his brief, the Commissioner argues that the fully stipulated facts contain evidence sufficient for us to hold that the Commissioner has carried his burden of proving petitioner liable as transferee under sections 6901 and 6902.

We believe that petitioner has conceded its liability as transferee for any taxes owed by the transferor. In any event we hold that petitioner is so liable. Transferee liability must be determined under the laws of Alabama. See *Commissioner* v. *Stern*, 357 U.S. 39 (1958). Those laws impose liability for corporate debts on the transferee of assets distributed in liquidation. *King* v. *Coosa Valley Mineral Products Co.*, *supra*; *Boothton Coal Min. Co.* v. *Tennessee Coal, Iron & R. Co.*, *supra*; *Kelly* v. *Andalusia Brick Co.*, *supra*. See also *Sloss* v. *State*, 264 Ala. 680, 89 So. 2d 174 (1956), for a discussion of the relationship between section 6901 and the liability imposed by Alabama law on the distributee of the assets of a liquidating corporation. See also *Louis Lesser*, 47 T.C. 564, 585 (1967). We can conceive of no reason why petitioner, who received the transferor's assets subject to the transferor's debts, should be exempt from transferee liability merely because of its relationship to the State of Alabama.

In his reply brief, the Commissioner informs us that petitioner may be entitled to a reduction in section 1245 gain to the extent it can show error in the Commissioner's determination with respect to the recomputed basis of the elevator. See sec. 1245(a)(2)(B). Accordingly,

*Decision will be entered under Rule 155.*