BADIAS & SEIJAS, INC. (A Liquidated Corporation), Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Badias & Seijas, Inc. v. Commissioner
Docket No. 5319-75.
United States Tax Court
T.C. Memo 1977-118; 1977 Tax Ct. Memo LEXIS 324; 36 T.C.M. (CCH) 518; T.C.M. (RIA) 770118; April 25, 1977, Filed Charles L. Ruffner,Sydney S. Traum and H. P. Forrest, for the petitioner. Curtis O. Liles, III, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in the Federal income tax of petitioner, Badias & Seijas, Inc. in the amounts of $102,345.03, $96,513.97 and $96,562.18 *325 for the calendar years 1969, 1970 and 1971, respectively. Respondent also determined additions to tax under section 6653(b), I.R.C. 1954, [1] in the amounts of $51,172.52, $48,256.99 and $48,281.09 for the calendar years 1969, 1970 and 1971, respectively. Some of the issues raised by the pleadings have been disposed of by agreement of the parties leaving as the sole issue for decision whether petitioner adopted a plan of liquidation on or before the date of sale of its operating assets, and within 12 months from the date of adoption of such plan distributed all assets to its shareholder in complete liquidation so that section 337 is applicable. FINDINGS OF FACT Petitioner Badias & Seijas, Inc. is a dissolved Florida corporation. It was dissolved by the State of Florida on July 2, 1973.On the date of dissolution the sole shareholder of petitioner was Felipe Valls, who resided then and at the time the petition in this case was filed in Miami, Florida. Petitioner filed its Federal corporate income tax returns for the calendar years 1969, *326 1970 and 1971 with either the District Director of Internal Revenue at Jacksonville, Florida or with the Director, Internal Revenue Service Center at Chamblee, Georgia. Petitioner was incorporated under the laws of the State of Florida on April 12, 1965, for the purpose of operating a restaurant business in Miami, Florida. The authorized, issued and outstanding stock of petitioner was 100 shares of common stock. At the end of 1969, Mr. Seijas and Mr. Garcia owned 50 shares each of the common stock in petitioner.During 1970, Felipe Valls acquired a 50 percent interest in petitioner resulting in equal ownership with Mr. Seijas. In October 1971, Mr. Valls purchased Mr. Seijas' common stock of petitioner for $31,400. This transaction resulted in Mr. Valls owning 100 percent of the authorized, issued and outstanding common stock of petitioner. On November 5, 1971, Florentino Perez entered into a contract with petitioner acting by its president, Felipe Valls, to purchase the business known as Badias Restaurant, which was the sole operating asset of the corporation. When Mr. Valls decided to sell the restaurant business, he intended to sell the corporate stock of petitioner. He *327 and Mr. Perez had approximately two business discussions with respect to the sale. Mr. Valls understood that Mr. Perez was unwilling to purchase petitioner's stock because of advice he received from his accountant. An oral agreement was reached between Mr. Valls and Mr. Perez that Mr. Perez would purchase the restaurant, and a price was established. Mr. Perez then went to his attorney to have the papers drafted that would be necessary to effectuate the sale. The documents prepared by Mr. Perez' attorney were for the purchase of the operating assets, other than cash and receivables, of petitioner rather than the stock owned by Mr. Valls. The contract between Mr. Perez and petitioner executed on November 5, 1971, provided in pertinent part as follows: RECEIPT IS HEREBY ACKNOWLEDGED OF THE SUM: Two Thousand Five Hundred Dollars ($2,500.00) as a deposit and part of the purchase price of the following described business upon the terms and conditions stated herein. One certain business known as BADIAS RESTAURANT, located at 1542-1550 S.W. 8th Street, Miami, Florida. Seller agrees to transfer to the buyer all of its right, title and interest in the name, the goodwill, leasehold *328 interest, merchandise and all fixtures, equipment and furniture, and rent and utilities deposits located therein. Purchase price shall be Sixty Eight Thousand One Hundred Two Dollars 00/100 ($68,102.00). The terms and conditions of sale are as follows: $2,500.00 in cash at the time of closing from which this deposit is a part. Buyer will execute a Chattel Mortgage and a promissory note for the amount of $65,602.00 to be paid to the seller in 48 monthly installment payments bearing interest of 9% and with a grace period of 45 days for each payment. The first 12 payments will be $800.00 each. It is agreed and understood that this transaction is subject to the buyer obtaining the transfer of certain lease dated September 8th, 1971, between SEVA INC. and BADIAS CEIJAS INCORPORATED. The assignment of the lease must have a statement from the Landlord in regard of that this such lease includes for the same rent the storage room, in a separate building and the tenants rights to use the 100% of the parking lot of the building less two parking spaces. The seller agrees to surrender position of the premises at the time on which this deposit will be signed. It is agreed *329 and understood that the seller will sign all the transfer forms and shall cooperate to transfer the beer and wine licenses to the buyer, being responsibility of the seller make all the necessary repairs in order to obtain the approval of the Zoning and Building Department of the City of Miami. (Pink form for transfer beer and wine licenses). Personal Property tax and Insurance Policies will be prorated as of the date of this Deposit Receipt against the first payment of the promissory note to be executed by the buyer to the seller. FELIPE VALLS as sold (sic) stockholder of seller's corporation and as 50% stockholders of SEVA INC., the owner of the building agrees that he will try in all the possible ways that SEVA INC. will grant an option for rent the store located at 1538 S.W. 8th Street, and an option to extended (sic) the actual lease to be assigned, for an additional term of five more years. It is agreed and understood that seller has only the right to use the name of BADIAS RESTAURANT in this particular business, and the transfer of their interest in the name can not be constructed as the sale of the name and only the transfer of their rights of use [of] the name. *330 FELIPE VALLS as seller and as President of International Equipment Inc., will give a guarantee in all the equipment located in this premises for the term of 90 days, on parts except compressors and labor. Buyer must be (sic) increase the fire insurance on this business to a minimum amount owed to seller. It is agreed and understood that seller and buyer accept that there is a concession agreement for the operation of the Cuban Coffee Shop which expires on May 19, 1973. Buyer is acting as an agent of a corporation to be formed in the State of Florida. The seller convenants and agrees to comply with the Bulk Sales requirements of the Uniform Commercial Code. The seller hereby expressly warrants that it has full power and authority to convey the said business according to the terms and conditions as hereinabove set out; and the seller affirms that it has good title to all goods listed on the said property and that there are no outstanding liens, security interest, or encumbrances whatsoever, except those listed herein. That this instrument contains the entire agreement of the parties to this transaction and there are no representation, warranties, or agreements, either *331 written or oral, expressed or implied, except those contained herein. Seller agrees not to compete in a similar business for five years within a radius of 10 blocks. It is agreed and understood that the risk of loss pending closing shall be in the buyer's responsibility. At the time of closing the seller agrees to furnish the buyer with an affidavit which shall set forth the following: 1. That the seller is not the plaintiff or defendant in any pending litigation, nor is there any judgment pending against the seller. 2. That the seller is not the subject of any bankruptcy or insolvency proceedings. 3. That at the time of closing there shall be no debts due and owing by the seller to any third party. On November 5, 1971, further documents were executed with respect to the sale. Mr. Perez executed a promissory note in the amount of $65,602 payable to "Badia's - Seijas, Inc., a Florida corporation." The note stated that it was secured by a chattel mortgage on the assets of the restaurant and that the deferred payments were to bear interest at a 9 percent rate. The sum was payable $800 per month for the first 12 payments with the remaining payments consisting of 36 *332 monthly payments of $1,963.56 each. On the same date, petitioner, by its president, Mr. Valls, executed and delivered a bill of sale of the assets of the restaurant in favor of Mr. Perez. Attached to the bill of sale was an itemized list of all assets of the restaurant setting out approximately 100 different items with an inventory count of each item enumerated. Other documents executed by Mr. Valls as president of petitioner included affidavits prepared by the attorney of the purchaser. One affidavit provided, among other things, that petitioner was the owner of the furniture, merchandise, fixtures, and equipment located at the restaurant and that such items were not encumbered by any liens. The other affidavit provided that Mr. Valls had been elected president of petitioner at a board meeting held on September 9, 1971; that a special meeting of the board of directors had been held on November 5, 1971, at which meeting a resolution for the sale and transfer of the assets of the corporation was adopted; and that the president of the corporation was authorized to execute documents to effectuate the sale by the corporation. Additionally, an assignment of lease, acceptance of assignment *333 and consent to assignment were executed by Mr. Valls as president of petitioner to allow the lease on the premises occupied by the restaurant, which were owned by a corporation partially owned by Mr. Valls, to be assigned to the purchaser. Mr. Valls asked the attorney for the purchaser who prepared the documents with respect to the sale to take the documents to his attorney to look over. Subsequent to the purchase date, Mr. Perez transferred the purchased assets to his wholly owned corporation named Badias Restaurant, Inc. Petitioner's cost of the assets sold to Mr. Perez was $44,563.91. The depreciation previously allowed on those assets was $23,066.56, leaving an adjusted basis of $21,497.35. Mr. Perez made the first payment of $800 by a check dated December 6, 1971, made payable to Felipe A. Valls. Payment was made directly to Mr. Valls because Mr. Valls had so requested. The following 13 monthly payments, through January 10, 1973, were made by checks drawn upon the account of Badias Restaurant, Inc. and made payable to Felipe A. Valls. These 14 checks totaled $13,527.12. Mr. Valls intended, when all petitioner's operating assets were sold on November 5, 1971, to take *334 for his own use the payments on the note and the funds in petitioner's bank account, which were petitioner's only other assets. On some date subsequent to the sale of the assets to Mr. Perez, the State of Florida, Department of Revenue, Sales Tax Division, conducted an audit of petitioner's business for a period beginning November 1969 through October 1971. As a result of this audit, the Sales Tax Division determined that there was an additional sales tax due from petitioner for the period under audit in the amount of $16,727.43. The total amount including penalties and interest was determined to be $23,042.04. Thereafter, from at least March 1973 through February 1974, Mr. Perez' corporation, Badias Restaurant, Inc., purchased at least 10 cashier's checks at the Riverside Bank of Miami, Florida totaling $19,509.61 payable to the Department of Revenue. Mr. Valls did not acknowledge the sales tax liability and did not agree that the payments to the Department of Revenue could be offset against the liability on the promissory note. Following the payment of these checks, Mr. Perez began making payments to petitioner, rather than to Mr. Valls personally. On February 14, 1974, Mr. *335 Perez' corporation purchased a cashier's check made payable to Badias Seijas, Inc. in the amount of $125.99. From March 1, 1974 through November 5, 1975, 20 checks totaling $39,271.20, each in the amount of $1,963.56 were drawn on the corporate account of Badias Restaurant, Inc. and made payable to petitioner. However, a check drawn on June 23, 1975, in the amount of $1,963.56 was made payable to Felipe A. Valls. Mr. Perez began making the checks payable to petitioner rather than Mr. Valls following the audit by the State of Florida because he had been advised to do so by his accountant. All of the checks drawn by Mr. Perez or caused to be drawn by him and made payable to Mr. Valls or petitioner were actually received by Mr. Valls. [2] All of the checks received from the purchaser were, immediately upon receipt, used to discharge personal obligations of Felipe Valls. Mr. Valls had difficulty in attempting to negotiate some of the checks made payable to petitioner. The bank where he presented the checks for payment would not accept his handwritten endorsement of the corporate name above his own name placed upon the checks. He then had rubber stamps prepared reflecting the name *336 of petitioner with Felipe A. Valls shown as president and a stamp bearing "pay to the order of Felipe A. Valls." However, most of the checks made payable to petitioner were negotiated by Mr. Valls, by endorsing the checks in his own handwriting.Thus, Mr. Valls received the proceeds of the checks made payable to petitioner without depositing the checks in the checking account of petitioner. Following the sale of the assets, petitioner's corporate bank account showed reduced activity. The funds in the account were used to pay bills of petitioner and to make distributions to Mr. Valls. The proceeds distributed to Mr. Valls were used to discharge personal obligations or to pay petitioner's obligations, the balance of which had been assumed by Mr. Valls. The corporate account reached a zero balance on August 4, 1972. On August 11, 1972, Mr. Valls deposited $10 to the account which had incurred debit memos of a nominal amount. The account *337 was closed on December 7, 1972. Felipe A. Valls, the sole shareholder of petitioner on the date of sale of the assets, was born in Santiago, Cuba. He came to the United States as a permanent resident in December 1960. He initially obtained employment as a salesman for a restaurant supply business, where he worked for approximately 2 years. Following this, petitioner went into business for himself in the form of a sole proprietorship to sell international business equipment. In 1964 Mr. Valls incorporated Feva Corporation, which owned the building where he conducted his equipment business. Mr. Valls has also held an interest as a shareholder in several other closely held corporations. He owned all of the stock of Elliott Trail Investments which was incorporated to obtain financing to commence a business. Mr. Valls owed 50 percent of Flava Plaza Investment Corporation which was incorporated for the purpose of obtaining financing to construct a building for a business. He owns 100 percent of Cova Corporation which was incorporated for the purpose of operating a restaurant. He owns 50 percent of Vallamo Corporation which was incorporated for the purpose of operating a restaurant. *338 He owns 50 percent of Elival Corporation, which was formed in 1970, and owns real estate. Mr. Valls also owned 50 percent of Seva Corporation which was formed in 1971 for the purpose of owning the building in which petitioner's restaurant business was operated and leasing that building to petitioner. It is customary for Mr. Valls to consult an attorney for the purpose of drafting any necessary documents after he has decided to enter a business deal. On the Federal corporate income tax return filed by petitioner for the calendar year 1971 the balance sheet totals for the end of the taxable year included as assets those items sold in November 1971. This return did not indicate that it was a final return of petitioner or that any of the assets of the restaurant business had been sold. [3] No interest income was reported on the return. The return was prepared by the same accountant who had prepared petitioner's income tax returns for 1969 and 1970. No formal plan of liquidation *339 was adopted by petitioner. Also, there was no written assignment by petitioner to Mr. Valls of the promissory note or chattel mortgage received pursuant to the sale of petitioner's assets. Mr. Valls, on his individual Federal income tax returns filed for 1971 and 1972, did not report any of the proceeds from the sale of the assets of petitioner to Mr. Perez. [4] Mr. Valls discussed with a representative of a bank the possibility of discounting the note petitioner received on the sale of its assets, but did not pursue the matter further when he was advised by the bank representative that the amount received upon discount of the note would be substantially less than its face value. In the statutory notice of deficiency, respondent included in the income of petitioner in 1971 the gain realized upon the sale of the assets of the restaurant business with the following explanation: (c) Sale of Assets It was determined that on November 5, 1971 the assets of the corporation were sold, and from which you realized ordinary income and capital gains. The sale does not *340 qualify as a Section 333 liquidation because no required election had been filed, nor does the sale qualify as a Section 337 liquidation because you did not liquidate within the required twelve month period. Thus your taxable income is increased $46,604.65 for 1971, computed as follows: Cost of Assets per Return
$44,563.91
Less: Depreciation Allowed
on Assets
23,066.56
Adjusted Basis
$21,497.35
Selling Price
$68,102.00
Adjusted Basis
21,497.35
Gains
46,604.65
Section 1245 Gain -- Ordinary Income
$23,066.56
Section 1231 -- Capital Gain
23,538.09
$46,604.65
OPINION Section 337(a)[5] provides, in general, that if a corporation adopts a plan of complete liquidation and within a 12-month period distributes all assets of the corporation, less those required to meet claims, no gain or loss is recognized to the corporation from the sale or exchange of property within the 12-month period. *341 Petitioner takes the position that under this provision no gain should be recognized from the sale of the operating assets of the restaurant business. It is petitioner's contention that an informal plan of liquidation was adopted on November 5, 1971, the date of sale of the assets, and on the same date the promissory note received from the purchaser upon the sale was equitably assigned by petitioner to its sole shareholder, Felipe A. Valls. Thus, petitioner concludes that a plan of liquidation was adopted and the assets distributed within a 12-month period, thereby meeting the statutory requirements of section 337. It is respondent's position that petitioner did not adopt a plan of liquidation and, in any event, if we should determine that petitioner adopted a plan of liquidation, the assets were not distributed within a 12-month period from the date of the adoption of a plan. [6]
*342 No formal plan of liquidation was adopted by petitioner. However, the failure to adopt a formal plan of liquidation is not dispositive of the issue. It is clear from the cases that the adoption of a plan of liquidation within the meaning of section 337 does not require the adoption of a formal resolution of liquidation by the directors or stockholders. The determination of whether a plan of liquidation existed at the time of the sale of the assets is a question of fact. In Mountain Water Co. of La Crescenta v. Commissioner,35 T.C. 418 (1960), we stated at page 426 that: If all the facts and circumstances indicate that the assets were in fact sold as a part of a plan to liquidate the company and the corporation in fact goes out of business and distributes its assets in complete liquidation within the 12-month period, it would seem that that purpose has been accomplished. * * * In the instant case the record is clear that all the assets of petitioner were in fact sold. The record is also clear that at the time these assets were sold Mr. Valls, petitioner's sole stockholder, *343 intended to take the funds from the sale of petitioner's assets and its remaining assets consisting of cash and receivables for his own use. While the record is not completely clear with respect to the intent of Mr. Valls for any further use of the corporate form, on the basis of the record as a whole, we conclude that the preponderance of the evidence supports petitioner's contention that Mr. Valls did not intend to use petitioner's corporate form any further but to let its existence cease or let petitioner "die." These facts are substantially the same as facts we recited in Alameda Realty Corporation v. Commissioner,42 T.C. 273, 281 (1964), as being indicative of a plan to liquidate the corporation. In that case we stated: The facts of the instant case show that after receiving an offer for the purchase of the Finance Building, but being unable to persuade the offeror to buy the Alameda stock instead, Raymond and Irma (the sole stockholders and directors of Alameda) decided to accept the offer and take the money received by Alameda from the sale of the building for their own use. The facts show that this decision was made on or shortly prior to October 6, 1955, when *344 Alameda entered into the contract to sell the Finance Building. The facts further show that the Finance Building was Alameda's only operating asset. After Alameda sold the Finance Building, its only asset other than debts due it by Raymond and Irma, was money and Raymond and Irma withdrew this money for their personal use as they planned to do when they agreed to have Alameda sell the building. These facts show a plan of liquidation and distribution of assets. * * * In our view, the facts quoted above parallel the facts in the instant case. Here, Mr. Valls, being unable to sell petitioner's stock, decided to sell petitioner's assets and to take the money received by petitioner from the sale for his own use. The facts show that this decision was made on or shortly prior to November 5, 1971, when petitioner entered into the contract to sell its assets. The facts further show that all of petitioner's assets except accounts receivable and cash were sold. Also, the facts here show that Mr. Valls withdrew from petitioner's bank account for his personal use all petitioner's funds not needed for paying petitioner's debts and took the payments made on the note given for petitioner's *345 assets for his own use. There were additional facts in the Alameda Realty Corporation case supporting our conclusion that section 337 applied to the sale of the building owned by that corporate taxpayer that are not present in the instant case. In the Alameda Realty Corporation case the facts showed that the corporation for the year that its assets were sold filed a Federal tax return marked "Final Return," which return showed no assets or liabilities and a distribution of all of its assets to its stockholders. In the instant case, petitioner filed a return for 1971 that showed it still owned the assets which it had in fact sold. Petitioner's return for 1971 was not marked "Final Return" and in no way indicated that its assets had been sold or that any amount had been distributed to its stockholders. Also, in the case of Alameda Realty Corporation, the stockholders of the corporation reported on their Federal income tax return for the year of the sale long-term capital gains from the disposition of their stock in the corporation. Mr. Valls, in the instant case, did not reflect on his return for 1971 any information with respect to the disposition of his stock in petitioner. *346 Respondent on brief suggests that the reason petitioner's tax return and Mr. Valls' tax return were filed as they were for the year 1971 was that Mr. Valls did not intend that tax be paid by either petitioner or by him personally on the disposition of petitioner's assets. The fact that the returns were filed as they were lends some support to respondent's contention in this regard. However, Mr. Valls did offer as a reason for his failure to report the transaction the fact that he thought the note which he believed had been assigned to him by the corporation had no ascertainable fair market value and therefore no amount should be reported by him until he had recovered the basis of his stock in petitioner through payments he received by taking the payments due on petitioner's note. Considering Mr. Valls' lack of expertise it is not beyond belief that Mr. Valls would arrive at such a conclusion.There is no evidence in the record to the contrary. Little support or lack of support of petitioner's contention can be drawn from the manner in which the corporate tax return was filed. Regardless of whether any income was reported from the sale of the corporate assets, petitioner's *347 1971 return should not have shown those assets as being on hand at the end of 1971 when they in fact had been sold. The corporate return also contained a number of other errors, such as showing Mr. Valls as only a 50 percent stockholder when in fact he owned 100 percent of the stock. In considering the evidence as a whole, we conclude that the facts here which parallel those in the Alameda Realty Corporation case are the vital facts to show a plan of corporate liquidation and distribution of assets. As was stated in Kennemer v. Commissioner,96 F.2d 177, 178 (5th Cir. 1938), affirming 35 B.T.A. 415 (1937): [An] intention to liquidate was fairly implied from sale of all assets of corporation and act of distributing the cash to the stockholders. * * * In that case the court referred to the "determining element" as being the intention to liquidate the business coupled with the actual distribution of the cash to the stockholders. Here, as in MountainWater Co. of La Crescenta v. Commissioner, supra, the facts show that the assets *348 were in fact sold as a part of a plan for the corporation to "liquidate" in that it would cease business and go out of existence by having its charter revoked by the state, and the corporation did in fact go out of business. On the basis of this record, we conclude that the preponderance of the evidence supports petitioner's position that it had adopted an informal plan of liquidation as of November 5, 1971. However, it is still incumbent upon petitioner to show that its assets were distributed to its stockholders within a 12-month period following the adoption of the plan of liquidation in order for section 337 to be applicable. The record shows that the bank account of petitioner, which constituted petitioner's only asset other than the note received from the sale of its operating assets, was distributed to Mr. Valls within one year following November 5, 1971. The question then is whether the note received by petitioner was distributed to its stockholder, Mr. Valls, within 12 months following November 5, 1971. If the note was not distributed to Mr. Valls, but merely the collection proceeds of the note, then petitioner has failed to meet the requirements of section 337 that *349 the corporate assets be distributed to its stockholders within a 12-month period. As petitioner points out, and respondent agrees, Florida law recognizes the doctrine of equitable assignment of a note in cases where doctrine is necessary to effectuate the intent of the parties. An oral assignment is effective as an equitable assignment under Florida law. Sammis v. L'Engle, 19 Fla. 800 (1883). In Asphalt Paving Inc. v. Ulery, 149 So.2d 370, 375 (Fla. 1963), the court stated: Any words or transactions showing an intention on one side to assign and on the other to receive, if supported by a valuable consideration, will operate as an effective equitable assignment. [Citation omitted.] * * * The direction by Mr. Valls to Mr. Perez to make the payments on the note to him, coupled with Mr. Valls' position as president and sole stockholder of petitioner and his use of the funds received for his own purposes, is sufficient in our view under Florida law to show an equitable *350 assignment of petitioner's note to Mr. Valls. Certainly, Mr. Valls as president and sole stockholder of petitioner would have been better advised to have made a formal assignment of petitioner's note to himself.However, in spite of the many business operations in which Mr. Valls had been engaged, it was apparent that he did not truly understand the niceties of the distinction between corporate ownership and individual ownership of property, or the formalities with which transactions should be undertaken to assure the intended result is attained. On this record we conclude that the direction by Mr. Valls to Mr. Perez at the time he, on behalf of petitioner, executed the sale of petitioner's assets to Mr. Perez to pay him personally for the assets amounted to an equitable assignment of petitioner's note to Mr. Valls. The consideration for the assignment was of course petitioner's stock which Mr. Valls at that time planned in effect to surrender by permitting the corporate life to expire and the charter to be taken by state law. While the facts in the instant case are not as clear-cut as have been facts in some prior cases, from the record as a whole we conclude that petitioner *351 did adopt a plan of liquidation prior to or on the date of the sale of its assets and did, within 12 months, distribute all of its assets to its stockholders.Therefore, the sale of petitioner's assets falls within the provisions of section 337. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. There remains a dispute between Mr. Valls and Mr. Perez as to whether the payments made to the Florida Department of Revenue for delinquent sales tax reduced the principal and interest due on the promissory note executed on November 5, 1971.↩
3. The return included none of the information specified under sec. 1.337-6(a), Income Tax Regs.In↩ addition, Form 966 which is required to be filed under sec. 6043 was not filed.
4. Mr. Valls reported interest income of $89 on his 1971 return, but the source of this interest is not shown.↩
5. For the taxable year in issue sec. 337, in relevant part, provided as follows: SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS. (a) General Rule.--If-- (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period. (b) Property Defined.-- (1) In general.--For purposes of subsection (a), the term "property" does not include-- (A) stock in trade of the corporation, or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year, and property held by the corporation primarily for sale to customers in the ordinary course of its trade or business, (B) installment obligations acquired in respect of the sale or exchange (without regard to whether such sale or exchange occurred before, on, or after the date of the adoption of the plan referred to in subsection (a)) of stock in trade or other property described in subparagraph (A) of this paragraph, and (C) installment obligations acquired in respect of property (other than property described in subparagraph (A)) sold or exchanged before the date of the adoption of such plan of liquidation. (2) Nonrecognition With Respect to Inventory in Certain Cases.--Notwithstanding paragraph (1) of this subsection, if substantially all of the property described in subparagraph (A) of such paragraph (1) which is attributable to a trade or business of the corporation is, in accordance with this section, sold or exchanged to one person in one transaction, then for purposes of subsection (a) the term "property" includes-- (A) such property so sold or exchanged, and (B) installment obligations acquired in respect of such sale or exchange. Sec. 337(a)↩ was amended by the Tax Reform Act of 1976, 90 Stat. 1520, P.L. 94-455.
6. It should be noted that in the statutory notice of deficiency respondent has asserted that section 1245 is applicable, thereby bringing about the imposition of the recapture rules of that provision. Petitioner has raised no issue with respect to this determination. The application of the recapture provisions of section 1245 takes precedence over the nonrecognition provisions of section 337 so that if we determine the statutory requirements of section 337 have been met, petitioner is still required to recognize gain in the amount of $23,066.56. Section 1.1245-6(b), Income Tax Regs.; Clayton v. Commissioner,52 T.C. 911 (1969). See also Troy State University v. Commissioner,62 T.C. 493 (1974). It may be that this amount is included in the following stipulation of the parties: In the tax year 1971 the petitioner's net taxable income is to be increased $23,352.86 considering both additional expenses and unreported gross receipts.↩